Alfred REHM, on behalf of himself and all others similarly situated, Plaintiff,

v.

EAGLE FINANCE CORP., Charles F. Wonderlic, Ronald B. Clonts, and Robert J. Braasch, Defendants.

No. 96 C 2455.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 28, 1997.

Steven Popuch, Swift, Popuch & Sinclair, Chicago, IL, Michael David Craig, Joann Broderick Harms, Schiffrin & Craig, Ltd., Buffalo Grove, IL, for Alfred Rehm.

Ray G. Rezner, Mark Scott Bernstein, John J. Sikora, Jr., Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg, Chicago, IL, for Eagle Finance Corp., Charles F. Wonderlic, Ronald B. Clonts and Robert J. Braasch.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Alfred Rehm (Rehm), on behalf of all persons who purchased or acquired the common stock of Eagle Finance Corporation (Eagle) during the period from May 12, 1995 to April 15, 1996 (class period), brought this class action suit alleging that defendant Eagle and its executive officers materially misrepresented Eagle's known credit losses and net income for the fiscal year 1995 in violation of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 (SEA), 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1996). Defendants now move to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), arguing that plaintiffs have failed to allege facts sufficient to show a strong inference of scienter as required by the Private Securities Litigation and Reform Act of 1995 (PSLRA). 15 U.S.C. § 78u–4(b)(2). For the reasons set forth below, defendants' motion is denied.

## BACKGROUND

In considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, we accept all well pled factual allegations in the complaint as true and draw all reasonable inferences from these facts in favor of the plaintiff. *Travel All Over the World, Inc. v. The Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir.1996). Read in this light, the facts are as follows.

Eagle is a Delaware corporation headquartered in Gurnee, Illinois which operates as a specialized financial services company engaged primarily in the acquisition and service of automobile and retail installment sales contracts by "sub-prime" consumers. At all relevant times, Charles F. Wonderlic (Wonderlic) was Chairman of the Board and Chief Executive Officer of Eagle. Robert J. Braasch (Braasch) was Eagle's Chief Financial Officer, Senior Vice President, and Treasurer. Ronald B. Clonts (Clonts) was President and a Director of Eagle.

During the class period, Eagle issued four separate press releases which reported quarterly and cumulative financial information for fiscal year 1995. The veracity of the con-

tents of these press releases, along with the SEC filings which accompanied them, is the crux of the issue in this case. Specifically, plaintiff contends that during the class period, Eagle issued statements which materially understated its credit losses, overstated its earnings, and artificially inflated stock prices.

The first press release was issued May 12, 1995. First quarter net income was reported at $1.240 million or $.30 per share. On approximately May 15, 1996, Eagle filed Form 10–Q for the first quarter which reiterated the financial information disclosed in the May 12 report. The May 15 10–Q was signed by defendant Braasch. It stated that Eagle's provision for credit losses during the first quarter was $13,000. In May 1995, Eagle's stock traded at approximately $14—$15 per share. In June 1995, the stock traded at approximately $17—$18 per share.

On August 7, 1995, Eagle issued its second press release. Reported net income for the second quarter and first six months of fiscal year 1995 was stated at $1.315 million and $2.555 million, respectively, which represented earnings of $.31 and $.61 per share, respectively. Eagle reported that as of June 30, Eagle's allowance for credit losses and nonrefundable acquisition discount totaled $16.892 million, or 13.3% of net receivables. On approximately August 14, 1995, defendants filed Form 10–Q for the second quarter which reiterated the financial information disclosed in its press release. The second quarter 10–Q was signed by Braasch. It stated that Eagle's provision for credit losses during the second quarter was $46,000. In August and September of 1995, Eagle's stock traded in the price range of $20—$24 per share.

In August of 1995, at the time when Eagle stock traded near the highest price in its history, defendant Clonts sold 35,000 shares on the open market, for which he received over $720,000 in proceeds. These sales by Clonts were the only public sales of Eagle stock he ever made.

On November 6, 1995 Eagle issued its third quarter press release which reported third quarter net income at $1.429 million or $.33 per share. Net income for the nine month period was reported at $3.983 million

or $.93 per share. Eagle's total allowance for credit losses was reported at $17.029 million, or 12.5% of its net receivables. The press release indicated that as of September 30, 1995, 8.8% of accounts were delinquent. In the press release, defendant Wonderlic stated that although delinquency rates had been unacceptable in the previous two quarters due to an inadequate collection staff, that trend had been reversed and delinquency was declining. (Compl. at 10—11.) Wonderlic described Eagle's first half credit loss experience as an "interim 'hiccup.'" (Compl. at 11.) Wonderlic conceded that Eagle could not at that time state with specificity what the appropriate level of credit loss allowance would be required at the year's end to cover the outstanding delinquencies. *Id.* However, he stated "with some confidence" that Eagle would be profitable in the fourth quarter and would show record earnings growth. *Id.*

The information in the November 6 press release was restated in Eagle's third quarter Form 10–Q which was filed on approximately November 15, 1995 and signed by Braasch. During the third quarter, Eagle made no provision for credit losses. Eagle's stock traded throughout November in the range of approximately $14¾ to $16⅛ per share.

Eagle issued its fourth quarter press release on March 13, 1996. A net loss of $348,000 or $.08 per share was reported for the quarter. Full-year results were stated at $3.530 million or $.82 per share. Total loss reserves were increased to $22.639 million, representing 14.8% of Eagle's net receivables. Installment contract delinquency was reported at 8.2%.

Eagle's fourth quarter provision for credit losses was reported at $2,194,000, a sharp increase over previously reported levels. Total credit losses for fiscal year 1995 were reported at $2,253,000. In the March 13 press release, Wonderlic explained the fourth quarter increase in loss reserves as follows:

> The fourth quarter charge was based on a stringent, comprehensive review of the credit performance of each loan pool, economic uncertainty and changes in evaluating the reserve adequacy of discounted loan purchases. We have conservatively

built our reserves to stay ahead of the loss curve and the standard we applied in the process exacted the cost of eliminating fourth quarter profitability and a record profitability for 1995 as a whole. (Compl. at 15.) Wonderlic reassured the public that the reserve adjustments were a one-time revision to cover unexpected losses and that the company looked forward to resuming its long-term growth. (Compl. at 15.)

Following the March 13 press release, several market analysts lowered their ratings of Eagle's stock due to its inadequate reserve accounting. On March 18, 1995, Eagle issued another press release in which Braasch stated that "the analysts' viewpoint isn't educated by what we believe are the relevant facts of the matter ... As to the level of reserves, it is our considered judgment, which is supported by our independent outside auditors, that the level of reserves taken against this portfolio is adequate." (Compl. at 16.)

However, on April 2, 1996, Eagle announced that it had been "unexpectedly" advised by its accountants, KPMG Peat Marwick LLP, that in connection with their year-end audit, the accountants would require the company to make a substantial addition to its allowance for credit losses as of December 31, 1995, resulting in a drastic reduction of previously reported earnings. After the April 2 announcement, Eagle's stock fell to close at $7¼.

On April 15, 1996, Eagle announced its restated results for fiscal year 1995. Actual earnings were reported at $325,000 or $.08 per share, which represented a 91% decrease from previously reported earnings of $3.530 million or $.82 per share. Eagle also reported an additional $7.3 million provision for credit losses, an increase of approximately 300% over the $2.3 million previously reported by Eagle. On April 15, 1996, the market price of Eagle stock closed on the NASDAQ at $7⅞₆.

On April 25, 1996, plaintiff Rehm filed the instant class action complaint alleging that defendants, both as direct participants under § 10(b) and as controlling persons under § 20(a) of the SEA, committed securities fraud by failing to report the proper amount of its credit losses in accordance with generally accepted accounting principles, thereby overstating its 1995 reported income.

## DISCUSSION

### I. Rule 12(b)(6) Standard

In order to have a claim dismissed under Rule 12(b)(6) the moving party must show that plaintiff's complaint fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not its merits. *Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583, 586 (7th Cir.1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990). A complaint should not be dismissed for failure to state a claim "unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). in order to withstand a motion to dismiss a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Gray v. County of Dane*, 854 F.2d 179, 182 (7th Cir. 1988).

### II. Standard for Pleading Scienter Under the Private Securities Litigation Reform Act of 1995

Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). One such rule is Rule 10b–5 which prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. To state a valid Rule 10b–5 claim, "a plaintiff must allege that the defendant: 1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the plaintiff relied, and 6) that reliance proximately caused the plain-

tiff's injury." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir.1995). Allegations of fraud under Rule 10b–5 must satisfy the requirements of Federal Rule of Civil Procedure 9(b) to survive a motion to dismiss. Rule 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." Fed.R.Civ.P. 9(b).[1] The Seventh Circuit has established that a sufficient level of factual support for a 10b–5 claim may be found where the circumstances of the fraud are pled "in detail." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Id.*

■ In this case, defendants contend that plaintiff Rehm has failed to adequately plead the scienter requirement for 10b–5 claims. Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). As defendants point out, under the recently enacted Private Securities Litigation and Reform Act of 1995 (PSLRA), which amends the Securities Exchange Act of 1934, the pleading standard for scienter in securities fraud cases has been made more rigorous, beyond mere Rule 9(b) requirements. 15 U.S.C. § 78u–4(b)(2). Pursuant to the PSLRA, in order to sufficiently allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If the complaint fails to do so, dismissal is required. 15 U.S.C. § 78u–4(b)(3)(A). .

Although the parties do not contest the fact that the PSLRA applies to the present action, they dispute the stringency of the pleading standard that § 78u–4(b)(2) adopts.

Prior to the enactment of § 78u–4(b)(2), plaintiffs were only required to plead scienter in accordance with Rule 9(b)'s more lenient particularity requirement. However, this broad standard created disuniformity among the various circuits as courts of appeals interpreted Rule 9(b) in conflicting ways. *See, e.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); *DiLeo*, 901 F.2d at 629; *In re GlenFed, Inc. Securities Lit.*, 42 F.3d 1541, (9th Cir.1994). Of these conflicting standards, the Second Circuit's rule requiring plaintiffs to allege facts "that give rise to a strong inference of fraudulent intent," *Shields*, 25 F.3d at 1128, was clearly the most rigorous. In an effort to eliminate circuit conflicts and curtail the filing of meritless fraud claims, Congress adopted the "strong inference" pleading standard modeled after the Second Circuit approach. H.R. Conf. Rep. No. 104–369, 104th Cong., 1st Sess. 41 (1995) (Conf.Rep.); *see also, In re Silicon Graphics, Inc. Securities Litigation*, Fed. Sec. L. Rep. (CCH) ¶ 99,325, at 95,961, 1996 WL 664639 (N.D.Cal. Sept. 25, 1996).

However, Congress did not simply codify the Second Circuit case law interpreting its pleading standard. *In re Silicon Graphics*, Fed. Sec. L. Rep. (CCH) ¶ 99,325, at 95,961. Instead, Congress specifically declined to make the Second Circuit's case law an explicit part of the statute. *Id.* at 95,962. As a result, defendants argue that the enactment of § 78u–4(b)(2) creates a heightened pleading standard that is even more stringent than that enunciated by the Second Circuit. Defendants point to the Conference Committee Report which emphasized that the PSLRA strengthened existing pleading requirements and therefore did not incorporate the Second Circuit's case law interpreting the scienter pleading standard.[2] According to defen-

---

1. The defendants argue that Rule 9(b) has no relevance to their motion to dismiss. (Def. Reply at 2–3.) Clearly this is wrong. It is true that we need not evaluate the sufficiency of the complaint directly under Rule 9(b), as defendants have not alleged that the complaint is deficient under that standard. However, insofar as the pleading standard set forth in the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b)(2), is based upon the judicial interpretation

of Rule 9(b)'s particularity standard, *see* discussion *infra*, Rule 9(b) is very relevant to our discussion of the adequacy of the complaint on this motion to dismiss.

2. The relevant portion of the Conference Committee Report cited by defendants reads as follows:

   The Conference Committee language is based in part on the pleading standard of the Second

dants, the Conference Report, when viewed alongside the President's veto message,[3] clearly demonstrates Congress' intent to raise the pleading standard for scienter even beyond the existing Second Circuit level.

As this is an issue of first impression in this circuit, we draw upon the case law of other jurisdictions for guidance. Despite conflicting judicial views on this issue, *see STI Classic Fund v. Bollinger Industries, Inc.,* No. 3:96–CV–0823–R, 1996 WL 866699 (N.D.Tex. Nov. 12, 1996); *In re Silicon Graphics,* Fed. Sec. L. Rep. (CCH) ¶ 99,325, at 95,961; *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1310 (C.D.Cal.1996), and ambivalent language in the legislative history, we agree with plaintiff that § 78u–4(b)(2) does not impose a more rigorous pleading requirement than that enunciated by the Second Circuit.

■ Specifically, we find that § 78u–4(b)(2) adopts the Second Circuit standard but declines to bind courts to the Second Circuit's interpretation of its standard. Three factors militate in favor of this conclusion. First, "the language used by the PSLRA to articulate its scienter pleading standard, i.e. 'strong inference,' mirrors the language traditionally employed by the Second Circuit in its application of Rule 9(b) to scienter pleadings." *Marksman,* 927 F.Supp. at 1310. That Congress chose to incorporate verbatim the language of the Second Circuit Rule 9(b) standard is a strong indication of its intent to enact in § 78u–4(b)(2) a pleading standard of approximately the same specificity. Second, as the plaintiff notes, the legislative history supports a read-

ing of the PSLRA consistent with this view. The Conference Report indicates that the "strong inference" language is based explicitly on the Second Circuit standard. Conf. Rep. at 41. That Congress chose not to codify Second Circuit case law does not mean that it specifically chose to disapprove the Second Circuit test. *Marksman,* 927 F.Supp. at 1311. In its report on the passage of the PSLRA, the Senate Banking, Housing, and Urban Affairs Committee articulated this position:

> The Committee does not adopt a new and untested pleading standard that would generate additional litigation. Instead, the Committee chose a uniform standard modelled upon the pleading standard of the Second Circuit. ... The Committee does not intend to codify the Second Circuit's caselaw interpreting this pleading standard, although courts may find this body of law instructive.

S.Rep. No. 98, 104th Cong., 1st Sess., 15 (1995). Finally, we believe that reading the PSLRA as adopting the Second Circuit standard adequately reconciles the conflicting policy concerns underlying the act. Ratcheting up the standard to conform with the stringent Second Circuit test satisfies Congress' goal of curtailing abusive securities litigation, *see* Conf. Rep. at 32, while still leaving room for aggrieved parties to bring valid securities fraud claims. To impose a higher pleading standard would make it extremely difficult to sufficiently plead a 10b–5 claim—an outcome which would certainly be contrary to the broad remedial purposes of the federal securities laws. *See Ernst &*

---

Circuit. The standard also is specifically written to conform the language to Rule 9(b)'s notion of pleading with "particularity."

Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent. Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.[23]

[23] For this reason, the Conference report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness.

Conf. Rep. at 41 & n. 23.

**3.** In President Clinton's veto message, he specifically objected to the new pleading standard, stating as follows:

> I am prepared to support the high pleading standard of the U.S. Court of Appeals for the Second Circuit—the highest pleading standard of any Federal circuit court. But the conferees make crystal clear in the Statement of Managers their intent to raise the standard even beyond that level. I am not prepared to accept that.

H.R. Doc. No. 150, 104th Cong., 1st Sess. at 1 (1995). As the defendants note, the PSLRA was passed over the President's veto. (Def. Mem. at 5.)

*Ernst,* 425 U.S. at 200, 96 S.Ct. at 1384. As this discussion makes clear, we conclude that a reading of § 78u–4(b)(2) that adopts a scienter pleading standard equivalent to the Second Circuit rule best comports with the language, history, and purpose of the PSLRA.

### III. *Application of the PSLRA's Pleading Standard*

■ Although we are not bound by the Second Circuit's pleading standard, we find that it is consistent with the language and purpose of the PSLRA and therefore an appropriate standard to apply in this case. Under the Second Circuit standard, the requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). Defendants argue that plaintiff's conclusory allegations that Eagle "knowingly" disseminated "false and misleading" statements are not sufficient to withstand a motion to dismiss either under the "motive and opportunity" or "conscious misbehavior or recklessness" tests.

### A. Motive and Opportunity

To satisfy the scienter requirement by this method, both a motive and an opportunity to commit fraud must be pleaded. In *Shields,* the Second Circuit defined these two elements as follows:

> Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

25 F.3d at 1130. There is no doubt that individual defendants Wonderlic, Clonts, and Braasch possessed the opportunity to carry out the alleged misrepresentations of Eagle's financial performance to the public since they were officers, directors, and substantial shareholders of Eagle with direct access to and broad control over the company's finan-

cial information. *See Cohen v. Koenig,* 25 F.3d 1168, 1173–74 (2d Cir.1994); *Marksman,* 927 F.Supp. at 1311.

■ Where the parties disagree is over the issue of motive. Plaintiff Rehm alleges that defendants had two separate motives for issuing misleading public statements that understated the amount of credit loss reserves by 300% and artificially inflated Eagle's stock price: (1) defendants were substantial shareholders of a young public company which was at impending risk of losing its access to capital markets if the truth about its actual credit losses was known; and (2) defendants' personal holdings in Eagle had value only in the public securities markets and that value was enhanced by maintaining Eagle' stock price at high level. Under established Second Circuit precedent, neither alleged motive is sufficient to support a "strong inference" of scienter.

With respect to plaintiff's first claim, we agree with the court in *Glickman v. Alexander & Alexander Services, Inc.,* No. 93–C–7594, 1996 WL 88570, at *7 (S.D.N.Y. Feb.29, 1996), which held that general allegations of the defendants' desire to raise capital are insufficient to satisfy the motive requirement. In *Glickman,* the court specifically declined to find sufficient allegations of motive where plaintiff had alleged that defendants falsely portrayed the company's financial condition in order to raise much needed capital. *Id.* at *6, n. 4. The court emphasized that "[a]llegations of motives that are generally held by similarly positioned executives and companies are insufficient to sustain a claim under the securities laws." *Id.* at *6. In this case, Rehm has merely made general averments that Eagle, as a "relatively young issue in the public markets," had an incentive to inflate its stock price in order to maintain its reputation in the capital markets and retain access to financing. (Pl. Opp. at 17–18.) Significantly, plaintiff does not allege a single example of Eagle actually seeking to acquire capital during the class period. This is precisely the type of generic pleading the *Glickman* court condemned. To permit such general allegations of motive to support the scienter requirement would subject companies to securities fraud lawsuits whenever

their public statements of corporate earnings were subject to downward revision. *See Glickman,* 1996 WL 88570, at *6.[4]

Plaintiff's second allegation of motive also fails to establish scienter. A plaintiff's broad allegation that insiders concealed information to enhance the value of their stock is insufficient to satisfy the Second Circuit pleading standard. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995); *Shields,* 25 F.3d at 1130; *Glickman,* 1996 WL 88570, at * 6. "[I]n looking for a sufficient allegation of motive, we assume that the defendant[s] [are] acting in [their] informed economic self-interest." *Shields,* 25 F.3d at 1130. In this case, Rehm has done nothing more than argue that defendants, as "substantial shareholders" of Eagle whose personal holdings "had real value only in the public securities markets," were motivated to increase stock prices to augment their own wealth. (Pl. Opp. at 18.) As the Second Circuit has made clear, "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." *Shields,* 25 F.3d at 1130. The same proscription against generalized pleading of scienter which this Court invoked in rejecting plaintiff's first allegation of motive also applies here. If scienter could be pled solely on the basis of plaintiff's allegations that defendants were motivated to defraud the public in order to inflate the stock price, "virtually every company in the United States that experiences a downturn in stock price would be forced to defend securities fraud actions." *Acito,* 47 F.3d at 54.

Moreover, where there are no allegations that defendants derived concrete benefits from the inflated stock prices, motive is not established. *Shields,* 25 F.3d at 1131. Here, two of the three individual defendants did not sell their stock during the class period, and therefore did not benefit from the inflated stock prices. This fact undermines plaintiff's claim that defendants sought to artificially raise the price of Eagle's stock in order to benefit from the increased value of their personal holdings. *See San Leandro Emer-*

*gency Med. Plan v. Philip Morris,* 75 F.3d 801, 814 (2d Cir.1996); *Acito,* 47 F.3d at 54.

■ Plaintiff makes the additional argument that defendant Clonts' sale of 41,000 shares of Eagle stock during the class period at prices ranging from $20.31—$21.00 specifically establishes his motive to defraud. (Compl.¶ 10.) It is true that "[a]llegations that a corporate insider either presented materially false information, or delayed disclosing materially adverse information, in order to sell personally-held stock at a huge profit can supply the requisite 'motive' for a scienter allegation." *Marksman,* 927 F.Supp. at 1312 (citing *Acito,* 47 F.3d at 54). However, insider trading during the class period only supports a strong inference of scienter where plaintiff can show that the trading activity was "unusual." *Acito,* 47 F.3d at 54. This requires a showing that the trading was "in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information." *Marksman,* 927 F.Supp. at 1312 (quoting *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598, 605 & n. 1 (N.D.Cal.1991)).

Plaintiff alleges that Clonts' sale was "unusual" because (1) he had never made any other sales of Eagle stock, and (2) he sold his shares at the point when Eagle stock was trading at its highest price level. First, we do not find it "unusual" in itself that Clonts' sale was the first he had made as owner of Eagle stock. Eagle stock was initially issued in April of 1994 and Clonts made his sale in August of 1995. That Clonts held onto his freshly issued shares for sixteen months before deciding to sell a portion does not constitute such anomalous behavior to give rise to a finding of motive. Second, although the timing of Clonts' sale raises some suspicion of deception, we believe that the relatively small magnitude of the sale militates against a finding of motive. "When a corporate insider sells only a small fraction of his shares in the corporation, the inference of scienter is

---

4. Rehm makes the additional argument that Eagle was actually suffering from a cash flow shortage and therefore needed to protect its potential sources of additional capital. (Pl. Opp. at 18.)

However, this purely speculative argument cannot, without factual substantiation, support a finding of scienter.

weakened." *Marksman,* 927 F.Supp. at 1312. Plaintiff does not allege that Clonts sold a large percentage of his corporate holdings. To the contrary, defendants make the unrebutted claim that Clonts sold only 6% of his personal holding of Eagle stock. (Def. Reply at 9, n. 7.) We cannot reasonably infer scienter on the basis of such a relatively small transaction. *See Acito,* 47 F.3d at 54 (holding that defendant's sale of less than 11% of his holdings did not constitute an "unusual" sale despite that fact that it coincided with artificially inflated stock prices).

Therefore, we find that the allegations of the complaint fail to give rise to a "strong inference" of scienter under the motive and opportunity test.

## B. Circumstantial Evidence of Conscious Misbehavior or Recklessness

■ In order to withstand a motion to dismiss, plaintiff may also allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Acito,* 47 F.3d at 52. "Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978) (alteration in original and quotation omitted), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness." *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989). In establishing the requisite circumstantial evidence, plaintiff must do more than speculate as to defendants' motives or make conclusory allegations of scienter; plaintiff must allege specific facts. *Shields,* 25 F.3d at 1129. The strength of the circumstantial allegations must be correspondingly greater than the allegations used to support "motive and opportunity." *In re In–Store Advertising Securities Lit.,* 878 F.Supp. 645, 647 (S.D.N.Y.1995). We find that plaintiff has alleged facts sufficient to support a strong inference of scienter under the "circumstantial evidence" test.

■ Plaintiff Rehm makes three arguments in support of his contention that his complaint sufficiently alleges circumstantial evidence of scienter. First, plaintiff argues that the financial information defendants issued in its press releases and public filings seriously deviated from the principles articulated in "Accounting for Contingencies," *Statement of Financial Accounting Standards No. 5* (1975) (FASB No. 5) and that defendants knew, or should have known, this fact. Specifically, FASB No. 5 requires that all estimated losses must be accrued and reported against current income. FASB No. 5, ¶ 8. Plaintiff contends that defendants' 91% overstatement of Eagle earnings in 1995 reflects an egregious miscalculation of credit losses in violation of the clear terms of FASB No. 5.

■ Allegations of a serious departure from GAAP are not by themselves sufficient to give rise to an inference of scienter. *In re In–Store Advertising,* 878 F.Supp. at 649. To adequately allege scienter, in addition to bare allegations of GAAP violations, the complaint must show that defendants recklessly disregarded the deviance or acted with gross indifference towards the purported material misrepresentations contained in the financial statements. *Id.* We believe that plaintiff's complaint satisfies this requirement. As stated above, the individual defendants controlled and approved the issuance of Eagle's public statements during the class period and had direct access to its financial information. According to the complaint, Eagle's quarterly press releases and Forms 10–Q for 1995 were all materially false and misleading in that they relied on credit loss accountings made in violation of FASB No. 5. The fact that these alleged accounting violations led to a drastic overstatement of Eagle's yearly earnings and that defendants were responsible for calculating and releasing the financial information tends to support the conclusion that the defendants acted with scienter. *Marksman,* 927 F.Supp. at 1313.

■ Additionally, that defendants had to record a massive year-end increase of $5

million in credit loss reserves and slash its reported yearly earnings from $3.530 million to $325,000 weighs heavily in favor of a finding of reckless disregard. While it is true that the mere fact that a company's financial reporting was inaccurate does not establish scienter, *see Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir.1996); *In re General Electric Securities Lit.*, No. 94–C–4024, 1995 WL 590639, at *4, (S.D.N.Y. Oct.4, 1995), *aff'd, Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir.1996), the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect the errors. *In re Leslie Fay Companies, Inc. Securities Lit.*, 835 F.Supp. 167, 175 (S.D.N.Y.1993) (rejecting independent auditor's motion to dismiss where allegations of large accounting errors gave rise to inference of scienter). The more serious the error, the less believable are defendants protests that they were completely unaware of Eagle's true financial status and the stronger is the inference that defendants must have known about the discrepancy.

Further, plaintiff's allegation that Eagle's financial reporting violated GAAP does not stand alone as the only circumstance suggesting fraudulent intent. As a second basis for scienter, plaintiff Rehm claims that since credit losses were the "defining characteristic" of Eagle's loan servicing business, defendants' contention that the additional $5 million provision for credit losses was "unexpected" is simply not credible. Plaintiff also makes a third argument that defendants' attempts to mollify public doubt about Eagle's financial health by putting an optimistic and reassuring "spin" on otherwise damaging credit loss reports, shows that defendants acted with knowledge of Eagle's deteriorating earnings. In three separate press releases—November 6, 1995, March 13, 1996, and March 18, 1996—defendants Wonderlic and Braasch issued public statements which conceded the significance of controlling credit loss, but also strongly asserted that Eagle had made the proper adjustments to its loss reserves and had rectified the problem. Significantly, on March 18, 1996, Braasch responded to Eagle's recently lowered stock rating by stating that "it is our considered

judgment, which is supported by our independent outside auditors, that the level of reserves taken against this portfolio is adequate." (Compl. at 16.) Less than two weeks later, Eagle announced that its loss reserve accounting was, in fact, severely deficient. We find that the crucial significance of accurate credit loss accounting in determining the financial viability of Eagle, combined with defendants' careful statements mitigating the seriousness of the credit loss problem, raises a strong inference that defendants acted with knowledge of their public misstatements or were willfully blind to the truth.

Defendants cite *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124 (2d Cir.1994), in opposition to this finding. In that case, plaintiff alleged that defendant executives of a bank misrepresented the bank's earnings in publicly issued financial information by dramatically understating loan loss reserves—a significant indicator of a bank's financial performance. *Id.* at 1126. The court held that the plaintiff had not pleaded "conscious misconduct or recklessness" despite defendants' string of overly optimistic financial reports which explicitly downplayed the bank's loan loss reserve problems. *Id.* at 1129—30. Specifically, the court held that it could not find scienter where plaintiff had failed to allege "that the company's disclosures were inconsistent with current data." *Id.* at 1129.

While there are definite analogies between *Shields* and this case, we find that *Shields* is distinguishable. Specifically, plaintiff Rehm's allegations of GAAP violations makes this case very different from *Shields,* where there was no allegation that the defendants were receiving flawed loan loss data. This is a critical difference. In this case, there was no "current data" inconsistent with Eagle's public statements since, as plaintiff alleges, the credit loss data Eagle received was systematically inaccurate due to violations of GAAP. The very heart of this case, then, is whether defendants knew or recklessly disregarded the systematic undercounting of credit loss reserves and nevertheless continued to disseminate the inaccurate data. If this is true, there may be no direct evidence showing defendants were aware of the true credit

loss figures. Instead, the only evidence would be the large reporting discrepancy and defendants' public attempts to downplay the seriousness of Eagle's credit loss situation. In this context, to require plaintiff to proffer evidence that defendants were fully aware of Eagle's actual credit loss situation would be incompatible with the recklessness prong of the "circumstantial evidence" test. If we are going to allow plaintiffs to plead scienter on the basis of circumstantial evidence, we cannot set the threshold showing of such circumstantial evidence so high as to effectively preclude valid securities fraud claims without clear evidence of conscious intent to mislead the public. In this case, the magnitude of accounting error alleged combined with defendants' public statements minimizing the credit loss problem give rise to a strong inference of scienter. To hold otherwise would eviscerate the "circumstantial evidence" prong of the scienter test by requiring plaintiff to plead specific facts indicating that defendants had actual knowledge of Eagle's true credit loss situation and disregard that information in disseminating misleading public reports.

Plaintiff does not, as defendants allege, merely use 20–20 hindsight to label as fraudulent all of the company's public statements made prior to the "unexpected" revelation of grossly understated credit losses. *See Shields*, 25 F.3d at 1129. To the contrary, plaintiff specifically alleges that defendants vastly understated Eagle's most critical financial indicator in violation of generally accepted accounting principles while making repeated public statements assuring investors of the reliability of its financial reports. Drawing all inferences in favor of the plaintiff, we find that the complaint successfully pleads a strong inference of scienter under the "circumstantial evidence" test.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied.