**GREAT NECK CAPITAL APPRECIATION INVESTMENT PARTNERSHIP, L.P., C. William Carter and Norman Ellison, Plaintiffs,**

v.

**PRICEWATERHOUSECOOPERS, L.L.P., Defendant.**

In re Harnischfeger Industries, Inc., Securities Litigation

Nos. 98–C–0524, 99–C–0598.

United States District Court, E.D. Wisconsin.

March 30, 2001.

Robert Harwood, Jeffrey Haber, Frederick Gerkens, III, New York City, for Plaintiffs.

Jeffrey Tone, Melville Washburn, Jeffrey Sharer, Chicago, IL, for Defendant.

### *DECISION AND ORDER*

ADELMAN, District Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 29, 1999, plaintiffs commenced this securities fraud class action on behalf of themselves and others who purchased the stock of Harnischfeger Industries ("Harnischfeger"), during the period November 20, 1997 through August 26, 1998 ("the class period"). Harnischfeger is a holding company for subsidiaries involved in the manufacture of machinery. Plaintiffs allege that defendant, PricewaterhouseCoopers, L.L.P. ("PwC"), Harnischfeger's outside auditor, violated Section 10(b) of the Securities Exchange Act of 1934, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78j) (the "Exchange Act") and Rule 10b–5, 17 C.F.R. § 240.10b–5, by issuing or contributing to false statements which artificially inflated the price of Harnischfeger stock.

First, plaintiffs allege that PwC issued an unqualified auditor's report on Harnischfeger's financial statements for the fiscal year ended October 31, 1997. The auditor's report was completed on November 18, 1997 and was included in Harnischfeger's Annual Report on Form 10K filed with the Securities and Exchange Commis-

sion ("SEC") on January 29, 1998. The report stated that Harnischfeger's 1997 financial statements were fairly presented in accordance with Generally Accepted Accounting Principles (GAAP), and that PwC had performed its audit in accordance with General Accepted Auditing Standards (GAAS). Plaintiffs allege that Harnischfeger's financial statements misrepresented the condition of the company and that PwC's report was also false.

Second, plaintiffs allege that Harnischfeger issued a press release on November 20, 1997 containing misrepresentations about its financial condition, and that PwC may be held liable for the release because it reviewed it and advised Harnischfeger that the financial information in the release conformed with GAAP.

Most of the alleged false statements relate to contracts entered into in 1996 by the Beloit Company ("Beloit"), a Harnischfeger subsidiary, with Asia Pulp and Paper Company ("APP"), which required Beloit to construct and install fine paper machines in Indonesia. According to plaintiffs the four APP projects represented the largest order in Beloit's history and involved a total value of about $600 million. Plaintiffs allege that Beloit had no previous experience with contracts of this size and scope and that the projects turned out to be both unprofitable and difficult to manage. As the result of financial difficulties related in part to these projects, Harnischfeger's earnings dropped dramatically in 1998, and by June 1999 the company was in bankruptcy. Plaintiffs also allege that Harnischfeger and PwC made misrepresentations concerning an adverse jury verdict of $95 million and certain contract disputes unrelated to the Indonesian projects.

Plaintiffs claim that they and other class members lost millions of dollars when Harnischfeger's stock plummeted after the truth about its financial situation became known, and that PwC's misstatements about the company and its financial statements contributed to their losses. In early June 1998 plaintiffs sued Harnischfeger and various corporate officers alleging that they too made false statements to the investing public. Those cases have been consolidated and are presently pending before me.

PwC moves to dismiss the complaint on three grounds: (1) contrary to Fed. R.Civ.P. 12(b)(6), 9(b) and the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, § 101(b), 109 Stat. 737, 743 (codified as 15 U.S.C. § 78u–4(b)) ("PSLRA"), the complaint fails to state with particularity facts giving rise to a strong inference that PwC acted with scienter; (2) the complaint is barred by the one-year statute of limitations because plaintiffs had "inquiry notice" of the claim more than one year before they commenced this suit; and (3) the complaint does not state a claim as to purchases of Harnischfeger stock made prior to January 29, 1998, the date that PwC's audit opinion was filed with the SEC, because PwC made no actionable statements prior to then.

## II. STANDARD OF REVIEW AND ELEMENTS OF CLAIM

I analyze defendant's motion to dismiss for failure to state a claim according to standards set forth in Fed.R.Civ.P. Rules 12(b), 9(b) and the PSLRA. Under Rule 12(b)(6) the complaint will be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Maple Lanes, Inc. v. Messer*, 186 F.3d 823, 824–25 (7th Cir.1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), *cert. denied*, 528 U.S. 1118, 120 S.Ct. 939, 145 L.Ed.2d 817 (2000). For purposes of a

motion to dismiss I accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996).

Rule 9(b) requires plaintiffs to plead "the circumstances constituting fraud ... with particularity." *In re HealthCare Compare Corp. Sec. Litig.,* 75 F.3d 276, 281 (7th Cir.1996). "Particularity" means that plaintiffs must plead the who, what, when, where and how of their fraud claim. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). The purpose of requiring that fraud be pleaded with particularity is to force the plaintiff to do more than the usual investigation before filing a complaint. *Ackerman v. Northwestern Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir. 1999).

■ Additionally, the PSLRA, which amended the Exchange Act, made the pleading standard for scienter in securities fraud cases more rigorous than the Rule 9(b) requirements. Pursuant to the PSLRA, in order to sufficiently allege scienter the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The PSLRA also requires plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

■ The substantive elements of a securities fraud claim are provided in § 10(b) of the Exchange Act, which states that it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). One such rule is Rule 10b–5, which prohibits the making of any untrue

statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5. To state a valid Rule 10b–5 claim a plaintiff must allege that the defendant: (1) made a misstatement or omission (2) of material fact (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused the plaintiff's injury. *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir.1995).

■ Scienter is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Seventh Circuit has interpreted *Hochfelder* as establishing that "reckless disregard of the truth counts as intent" for the purpose of the 10b–5 scienter requirement. *SEC v. Jakubowski,* 150 F.3d 675, 681 (7th Cir.1998) (citing *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1044–45 (7th Cir. 1977)). "Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill.1997) (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978) (internal alteration and quotation marks omitted)). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness." *Id.* (ellipses in original; internal quotation marks omitted) (quoting *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989)).

The PSLRA does not elaborate on what facts or factual situations will give rise to "a strong inference" of intent to deceive or reckless disregard for the truth, and the Seventh Circuit has not yet addressed the PSLRA pleading standard. *See Chu v. Sabratek Corp.,* 100 F.Supp.2d 815, 822 (N.D.Ill.2000). Some courts have held that the requisite strong inference under the PSLRA may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Rehm,* 954 F.Supp. at 1253 (adopting Second Circuit's Rule 9(b) standard as expressed in *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)). The central requirement under the PSLRA however, is not that specific types of facts must be alleged (for instance, facts that imply motive and opportunity), but rather that the facts that are alleged support a strong inference that the defendant acted recklessly or knowingly. *Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 938 (N.D.Ill.1999).

## III. DISCUSSION

### A. Statements Attributable to PwC

Before addressing the question of whether plaintiffs have adequately pleaded that PwC knowingly made misstatements, I need to determine what statements may be attributed to PwC for purposes of § 10(b). Without conceding that it made misstatements, PwC agrees that it would be responsible for misstatements in its audit report. PwC, however, disputes plaintiffs' claim that it may be held liable for misstatements in the November 20, 1997 press release merely because it reviewed the release and advised Harnischfeger that the information in the release conformed with GAAP.

■ A party who aids and abets a misrepresentation may not be held liable under § 10(b). Rather, the statute "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. The proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (citations omitted). In *Central Bank* the Supreme Court stated that such "secondary" liability would "circumvent the reliance requirement" of § 10(b) by allowing a plaintiff to recover "without any showing that [he] relied upon the [defendant's] statements or actions." *Id.* at 180, 114 S.Ct. 1439. Plaintiffs argue, however, that even though PwC may not be held liable as an aider and abettor, its participation in the press release was extensive enough for it to be considered a primary violator of § 10(b) and Rule 10b–5.

■ Since the Supreme Court decided *Central Bank,* the Seventh Circuit has not had occasion to address the question of what degree of participation in the commission of a deceptive act is sufficient to hold a secondary actor such as an accountant liable for securities fraud as a primary violator. However, a number of points with respect to this issue are clear. First, an accountant's liability for aiding and abetting is hard to distinguish from primary liability. *DiLeo,* 901 F.2d at 628. Second, based on the decisions of those circuits that have addressed the issue, a general rule can be said to have emerged: a secondary actor must actually make, author, publicly adopt or allow its name to be associated with a misleading statement in order for it to be held liable as a primary violator of § 10(b) and Rule 10b–5.

A number of cases illustrate this principle to varying degrees. *See Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir.1996) (auditors must themselves make a false or misleading statement that they know or should know will reach potential investors); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (a secondary actor cannot incur primary liability for a statement not attributed to it when disseminated); *Binder v. Gillespie*, 184 F.3d 1059, 1067 (9th Cir. 1999) (an auditor may not be held liable where complaint merely alleges that it assisted in preparing misleading financial statements that were solely attributed to the company and its management), *cert. denied*, 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000).

Plaintiffs argue that I should adopt a more lenient "significant participation" test for primary liability. They rely in part on *In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 628 (9th Cir.1994). However, I do not read that case as supporting plaintiffs' argument for a more liberal standard. In *Software* the Ninth Circuit held that an accounting firm could be liable as a primary violator where two letters sent to the SEC were prepared after extensive review and discussions with the firm and referred the SEC to two of the firm's partners for further information. Unlike the present case the accounting firm in *Software* was identified in the key document. Further, the Ninth Circuit's more recent decision in *Binder, supra*, indicates that it has not adopted the test advocated by plaintiffs.

Plaintiffs also rely on *Carley Capital Group v. Deloitte & Touche, LLP*, 27 F.Supp.2d 1324 (N.D.Ga.1998). However, that case is distinguishable because there the plaintiffs alleged not just that the auditor participated or reviewed the report containing the misrepresentation, but that it "created the misrepresentation by directing [the company] to include [certain] revenue and income in the report. More than mere participation, complicity or assistance, the Plaintiffs [had] essentially alleged that the [auditor] was the author of the alleged misstatement." *Id.* at 1334–35.

■ In the present case plaintiffs allege that PwC assisted with the press release by reviewing it and advising Harnischfeger that it conformed with GAAP. Plaintiffs do not allege that PwC drafted the release, publicly adopted it or allowed its name to be associated with it. Thus, based on the facts alleged in the complaint, I conclude that PwC cannot be held liable under § 10(b) as a primary violator for misstatements in the release. The facts alleged suggest that PwC's actions with respect to the release more closely approximate aiding and abetting Harnischfeger's misstatements than making misstatements itself. Thus, it would be inconsistent with *Central Bank* to hold PwC liable for the statements in the release, and I decline to do so.

PwC may, however, be held liable for statements in the audit report. PwC's report was first disseminated to investors on January 29, 1998 when it was filed with the SEC. It follows, therefore, that plaintiffs cannot state a claim against PwC based on purchases of Harnischfeger stock made prior to that date.

## B. Adequate Pleading of Scienter

### 1. Harnischfeger Misstatements or Omissions

Reduced to its basic elements plaintiffs' claim is that Harnischfeger was in financial difficulty prior to the end of fiscal year 1997, that it attempted to hide the difficulty by disseminating misleading financial statements and that PwC vouched for such statements knowing of or recklessly ignoring their falsity. Specifically, plaintiffs al-

lege that Harnischfeger failed to disclose that by the end of fiscal year 1997 it was experiencing substantial cost overruns on the first two APP projects. The overruns were allegedly so significant that by the end of the fiscal year the costs of the two projects already exceeded the sales price of the two fine paper machines. Plaintiffs further allege that Harnischfeger covered up the overruns by revising its cost estimates and impermissibly shifting some $20 million in costs from the unprofitable projects to the two projects that had not yet been commenced. Similarly, plaintiffs allege that Harnischfeger falsely represented that the cost of two electrical machines required for the first two projects was $9.5 million per machine when it was actually $17 million.

Plaintiffs also allege that Harnischfeger utilized an inappropriate accounting method which obscured its true financial condition. Because the projects were to be completed over a number of years Harnischfeger used the percentage of completion ("POC") method to represent profits and losses relating to the projects. Under this method the company recognized revenue by comparing costs already incurred with estimated total costs to measure the progress of the projects toward completion. Plaintiffs allege that by the end of fiscal year 1997, with two of the APP projects experiencing large cost overruns, Harnischfeger knew but did not disclose that it did not have internal controls in place to enable it to reasonably estimate the costs of completing the projects. Further, it allegedly had no reliable way of knowing what, if any, income would be realized from the projects in the future. In addition, plaintiffs allege that Harnischfeger shifted $16.5 million in future revenue to the present by improperly increasing the sales price of the machines. Thus, by understating costs and overstating revenue plaintiffs contend that Harnischfeger

overstated its income for fiscal year 1997 by at least $27 million.

Plaintiffs allege that some of Harnischfeger's accounting practices were not only misleading but also violated GAAP. For example, plaintiffs allege that Harnischfeger's use of the POC method violated GAAP because the POC method required that Harnischfeger be able to accurately estimate its progress toward completion of the projects and the costs and revenue associated with each step toward completion. Because Harnischfeger lacked the capacity to make such estimates and was already experiencing cost overruns, plaintiffs allege that GAAP required it to recognize its losses immediately and to defer the recognition of potential income.

Plaintiffs also allege that Harnischfeger violated GAAP by failing to recognize a $95 million adverse Idaho jury verdict in favor of the Potlatch Corporation ("Potlatch") as a charge to earnings at the time it was entered. Harnischfeger disclosed the verdict in a note to its 1997 financial statement:

> The Company is party to litigation matters and claims which are normal in the course of its operations.... One of the claims against Beloit involves a lawsuit brought by Potlatch Corporation that alleges pulp line washers supplied by Beloit for less than $15,000[,000] failed to perform satisfactorily. In June 1997, a Lewiston, Idaho jury awarded Potlatch $95,000[,000] in damages in the case. Beloit has appealed this award to the Idaho Supreme Court. While the eventual outcome of the Potlatch case cannot be predicted, reserves in the October 31, 1997 Consolidated Balance Sheet are less than the full amount of the jury award.

[Compl. ¶ 33.] Plaintiffs further allege that Harnischfeger should have disclosed a potential charge against earnings of $37

million to resolve a long-standing contract dispute, as well as anticipated losses of $8 million on several small contracts. (*Id.* ¶¶ 49(b), 51, 139.)

## 2. PwC's Knowledge

Plaintiffs also allege facts relating to PwC's knowledge of Harnischfeger's financial condition and misleading financial statements. Plaintiffs allege that as of September 30, 1997, PwC knew that Harnischfeger's costs relating to the first two APP projects had already exceeded the sales price of the fine paper machines, that it had revised its cost estimates by $20 million and that it impermissibly shifted costs to future projects. Plaintiffs specifically allege that PwC knew these things because Harnischfeger told it so. They allege that Harnischfeger revised its cost estimates in direct response to PwC's questions and that PwC recklessly accepted the revision without further inquiry.

Plaintiffs further allege that PwC knew that the cost of the electricity machines for the projects was $17 million each rather than the $9.5 million represented by Harnischfeger. Plaintiffs state that Harnischfeger advised PwC of this when it disclosed to PwC that APP had informally agreed to permit it to increase the price of future projects to offset the understatement. Plaintiffs allege that PwC was at least reckless in not substantially auditing this matter before representing that Harnischfeger's action was reasonable.

With respect to scienter plaintiffs also allege that PwC acknowledged in a 1997 letter that one of Beloit's divisions had incurred cost overruns of $25 million, that it was aware that Harnischfeger had not undertaken a cost analysis of the APP projects and knew that Harnischfeger did not have the ability to accurately estimate the costs of completing the projects. Notwithstanding this knowledge plaintiffs allege that PwC did not investigate these issues. Plaintiffs also allege that PwC

asked Harnischfeger about the $16.5 million sales price increase on the first two fine paper machines and received no reasonable explanation, but nevertheless ratified Harnischfeger's deceptive accounting presentation of the matter.

Plaintiffs also allege, in support of their claim of scienter, that PwC acknowledged that Harnischfeger's estimates of the auxiliary costs of the APP projects, i.e., costs of items other than the machines, were "aggressive," and that there were "inherent risks associated with delivery and start-up of machines in Indonesia." (Compl.¶¶ 118(b), 120.) Plaintiffs further allege on the scienter issue that PwC said that the delivery schedule for the first two projects was "extremely tight with regard to the shipment of major portions of the machine that are essential to erection" and that "any slippage in the shipping schedule may cause a start up problem." (Compl.¶¶ 112, 118(b), 120.) Plaintiffs also specifically allege that PwC knew that Harnischfeger's internal auditors did not evaluate the status of the Indonesian contracts during fiscal year 1997, and that Harnischfeger lacked the capacity to determine their ongoing financial condition.

Finally, plaintiffs allege that PwC violated GAAS. They state that in the face of so many warning signs PwC was required by GAAS to conduct a more substantive audit rather than to accept Harnischfeger's unsupported explanations of the numbers in its financial statements. Additionally, plaintiffs allege that because of the uncertainty about so many aspects of the APP projects GAAS required that PwC perform one or more of a number of audit procedures such as visiting project sites and testing Harnischfeger's methodology for estimating costs and recognizing income. Plaintiffs further allege that, because PwC knew that Harnischfeger had not previously undertaken a project as complex as the

APP venture and that it itself had no experience in auditing such a project, GAAS required that it retain a firm with specialized knowledge to assist with the audit. By failing to take any such steps plaintiffs contend that PwC did not actually conduct an audit.

■ I conclude that plaintiffs have pleaded facts from which it may be strongly inferred that PwC made misstatements or omissions that, insofar as they related to cost overruns and other consequences to Harnischfeger resulting from its handling of the APP projects, were made with reckless disregard for the truth. Plaintiffs have alleged facts that, if true, strongly suggest that the mistakenness of Harnischfeger's financial statements relating to the APP projects was so obvious that PwC had to have been aware of it. An egregious refusal to see the obvious or to investigate the doubtful may sometimes give rise to an inference of recklessness. *Rehm*, 954 F.Supp. at 1246.

■ Plaintiffs here have done more than simply allege "fraud by hindsight." *See DiLeo*, 901 F.2d at 628. While an overstatement of revenues or an auditor's endorsement of a client's overstatement of revenues does not by itself establish scienter, *see Chu*, 100 F.Supp.2d at 824, plaintiffs, here, have also alleged facts indicating that PwC should have realized that Harnischfeger was experiencing substantial cost overruns and was utilizing a variety of questionable accounting mechanisms to hide its true condition. Plaintiffs have alleged facts indicating that PwC knew that Harnischfeger lacked experience in managing such large projects and lacked the internal controls to be able to estimate costs, profits or losses. Plaintiffs have alleged facts suggesting that Harnischfeger's accounting techniques violated GAAP and that PwC failed to make the investigation required of an independent auditor and violated GAAS.

■ While violations of GAAP without out more do not establish scienter, violations of professional standards, when combined with other circumstances suggesting severe recklessness, may support a strong inference of scienter. *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 46 F.Supp.2d 1042, 1048 (C.D.Cal.1999), *aff'd*, 234 F.3d 1277 (9th Cir.2000). Moreover, deliberately ignoring "red flags" such as those alleged here can constitute the sort of recklessness necessary to support a § 10(b) violation. *Miller v. Material Scis. Corp.*, 9 F.Supp.2d 925 (N.D.IIL.1998). Thus, PwC's motion to dismiss for lack of scienter will be denied insofar as it pertains to statements or omissions by PwC regarding Harnischfeger's financial condition relating to its handling of the APP projects.

■ However, with respect to PwC's representations regarding the $95 million *Potlatch* verdict, the $37 million charge to resolve the "long-standing contract dispute," and the $8 million in anticipated losses on small contracts (the first two unrelated to the Indonesian APP projects, and the third apparently unrelated), plaintiffs have not alleged sufficient facts from which it may be strongly inferred that PwC acted with scienter. Plaintiffs' have alleged little more than that Harnischfeger's accounting treatment of these matters violated GAAP. A failure to follow GAAP without more does not necessarily amount to fraud. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994). Unlike their allegations with respect to the APP projects plaintiffs have alleged few, if any, facts tending to suggest that PwC acted with scienter regarding Harnischfeger's accounting violations in connection with these matters, even if it did condone them. Moreover, with respect to the *Potlatch* verdict, although Harnischfeger may have wrongly presented it from an ac-

counting standpoint it, nevertheless, accurately represented the facts of the matter in a note to its financial statements. PwC's motion to dismiss claims relating to the *Potlatch* matter, to the "longstanding contract dispute," and to the $8 million in anticipated losses will be therefore be granted as set out in the footnote.[1]

## C. Statute of Limitations

Actions alleging a violation of Rule 10b–5 must be brought within one year after the discovery of the facts constituting the violation and within three years after the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (adopting limitations periods from 15 U.S.C. § 77m). The one year limitation period begins to run when the plaintiff is put on inquiry notice of the fraud rather than when the plaintiff actually discovers it. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir.1995). Inquiry notice occurs when the victim of the alleged fraud becomes "aware of facts that would have led a reasonable person to investigate whether he might have a claim." *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir.1997) (internal quotation marks omitted) (quoting *Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718, 722 (7th Cir. 1993)). This point is reached when an investor has "learned or should have learned the facts that he must know to know that he has a claim." *Law v. Medco Research, Inc.*, 113 F.3d 781, 785 (7th Cir. 1997). This means that the investor must not only be on notice of the need to conduct further inquiry, but must also be in a position where he can learn the facts underlying the claim with the exercise of reasonable diligence. *Marks*, 122 F.3d at 367.

In the context of a motion to dismiss I must keep in mind that a plaintiff in a securities fraud case is not required to plead facts showing that his suit is timely. *Tregenza*, 12 F.3d at 718. The statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint. *Fugman v. Aprogenex, Inc.*, 961 F.Supp. 1190, 1198 (N.D.Ill.1997). *See also LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 447 (7th Cir. 1995) (suggesting that statute of limitations questions are easier to resolve after discovery). However, if a plaintiff pleads facts that show that his suit is time-barred he can plead himself out of court and a judge may grant a defendant's motion to dismiss. *Tregenza*, 12 F.3d at 718.

Plaintiffs filed suit against PwC on May 28, 1999. PwC argues that plaintiffs' suit must be dismissed because plaintiffs had inquiry notice of PwC's violation on April 27, 1998, when Harnischfeger issued a press release reporting that "it [had] discovered cost overruns and possible accounting irregularities in its Beloit Corporation subsidiary limited to four large, ongoing projects in Indonesia." (Compl. at ¶ 45 quoting release.) The release also reported that the "cumulative effect" of those overruns and possible irregularities was expected to be approximately $155 million, before taxes, and that Harnischfeger would increase by $100 million a special charge that was previously announced in a February 23, 1998 press release. *Id.*

---

1. Claims stemming from allegations in Complaint paragraphs 27(b), 29(g), 34(c), 52(b), 54, 57, 67, 135, and 138, relating to the jury verdict; and claims stemming from allegations in paragraphs 49(b), 51, and 139, regarding the $37 million charge to resolve the long-standing contract dispute and the $8 million in anticipated losses on several small contracts.

 Harnischfeger's April 27 press release, however, did not mention PwC or its audit report. Further, it contained no facts suggesting that if the audit of Harnischfeger's statements was deficient, then the auditor acted with scienter. In order to trigger the statute of limitations the facts constituting inquiry notice "must be sufficiently probative of fraud—sufficiently advanced beyond the stage of mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit." *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir.1997).

PwC argues that plaintiffs' complaint in the Harnischfeger case, filed June 5, 1998, should be construed as an admission that the April 27 press release was sufficient to put plaintiffs on inquiry notice of its claim against PwC. PwC points to the that complaint's allegations that the release "stunned the Market" (Case No. 98–C–524 R. 1 [Compl.] ¶ 47), and disclosed "fraudulent accounting." (*Id.* ¶ 54.) However, on a motion to dismiss I must draw all reasonable inferences in favor of the plaintiff. Plaintiffs' allegations against Harnischfeger do not necessarily suggest that they were on notice that they might have a claim against PwC. Therefore, PwC's motion to dismiss based on the statute of limitations will be denied.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that defendant PwC's motion to dismiss the class action complaint (R. 9) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that plaintiffs' claims based on purchases of Harnischfeger stock prior to January 29, 1998, and plaintiffs' claims based on PwC's representations regarding the *Potlatch* verdict, the "longstanding contract dispute," and $8 million in anticipated losses are **DISMISSED.**

**IT IS FURTHER ORDERED** that plaintiffs' motions to file an over-length brief and a sur-reply brief (R. 22, 27) are **GRANTED.**