91 F.Supp.2d 706 (2000)
In re RELIANCE SECURITIES LITIGATION.
William Eric Graham, et al., on behalf of themselves and all others similarly situated, Plaintiffs,
v.
Taylor Capital Group, Inc. f/k/a Cole Taylor Financial Group, Inc., Cole Taylor Bank, Jeffrey W. Taylor; Bruce W. Taylor, Sidney J. Taylor, Lori Cole, Shirley Cole, Cathy Cole Williams, Thomas L. Barlow, Howard B. Silverman, James D. Dolph, J. Christopher Alstrin, Michael Bernick, William S. Race, Ross J. Mangano, Solway F. Firestone, Melvin E. Pearl, Dean L. Griffith, KPMG Peat Marwick, LLP, ABN AMRO Inc. f/k/a the Chicago Corp., and Sandler O'Neill Corporate Strategies, Defendants.
No. MDL 1304,
Civ. A. No. 99-858-RRM.
United States District Court, D. Delaware.
April 19, 2000.
*707 *708 *709 *710 R. Bruce McNew, Taylor & McNew, LLP, Greenville, Delaware; Mark Minuti, Saul, Ewing, Remick & Saul, Philadelphia, Pennsylvania; David B. Kahn, Mark E. King, and Elissa C. Chase, David B. Kahn & Associates, Ltd., Northfield, Illinois; Joseph Casseb, Goode Casseb Jones Riklin Choate & Watson, P.C., San Antonio, Texas; David R. Scott, and Neil Rothstein, Scott & Scott, LLC, Colchester, CT; John Lingner, Kakacek & Lingner, Chicago, Illinois; Michael S. Etkin, and John K. Sherwood, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, P.C., New York, New York; Bernard Wm. Fischman, Tinsman & Houser, Inc., San Antonio, Texas; Arthur Ungerman, Law Offices of Arthur Ungerman, Dallas, Texas; W.D. Masterson, and William G. Shaw, Jr., Kilgore & Kilgore, Dallas, Texas; William S. Lerach, Helen J. Hodges, Katherine L. Blanck, and Jeffrey D. Light, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, California; Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, California; Henry F. Field, Henry F. Field, Ltd., Chicago, Illinios; Ronald L. Futterman, and Michael I. Behn, Futterman & Howard Chtd., Chicago Illinois; counsel for plaintiffs.
James L. Holzman, and Bruce E. Jameson, Prickett, Jones & Elliott, Wilmington, Delaware; Steven P. Handler, Steve Hoeft, David S. Rosenbloom, and Adam Deutsch, McDermott, Will & Emery, Chicago, Illinois; counsel for defendants J. Christopher Alstrin, Jeffrey W. Taylor, Bruce W. Taylor, Sidney J. Taylor, Taylor Capital Group and Cole Taylor Bank.
Laurie S. Silverstein, and Arthur L. Dent, Potter Anderson & Corroon, LLP, Wilmington, Delaware; David Kristenbroker, Leah J. Domitrovic, Pamela Gregory Smith, and Theresa L. Davis, Freeborn & Peters, Chicago, Illinois; counsel for defendant Melvin E. Pearl.
William H. Sudell, Jr., and Martin P. Tully, Morris, Nichols, Arhst & Tunnell, Wilmington, Delaware; Timothy W. Mountz, Baker & Botts L.L.P., Dallas, Texas; David D. Sterling, Baker & Botts L.L.P., Houston, Texas; counsel for defendant KPMG Peat Marwick LLP.
*711 Francis J. Murphy, Murphy Spadaro & Landon, Wilmington, Delaware; Bruce R. Meckler, James H. Kallianis, Jr., and Christopher E. Kentra, Meckler, Bulger & Tilson, Chicago, Illinois; counsel for defendant Thomas L. Barlow.
Michael D. DeBaecke, Blank Rome Comisky & McCauley, LLP, Wilmington, Delaware; Thomas D. Laue, and Robert H. Griffith, Ungaretti & Harris, Chicago, Illinois; counsel for defendant ABN AMRO Inc., as successor to The Chicago Corporation.
R. Franklin Balotti, Lisa A. Schmidt, and Peter B. Ladig, Richards, Layton & Finger, Wilmington, Delaware; Thomas I. Matyas, Richard M. Hoffman, and Michael A. Kaeding, Wildman, Harrold, Allen & Dixon, Chicago, Illinois; counsel for defendants Irwin Cole, Lori Cole, Shirley Cole, and Cathy Cole Williams.
Henry E. Gallagher, Jr., Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; John W. Rotunno, Stephen J. O'Neil, and Sarah K. Johnson, Bell, Boyd & Lloyd LLC, Chicago, Illinois; counsel for defendants Solway F. Firestone, Dean L. Griffith, Ross J. Mangano and William S. Race.
Richard D. Kirk, Morris, James, Hitchens & Williams LLP, Wilmington, Delaware; Steven R. Smith, Richard T. Greenberg, and William F. Zieske, Ross & Hardies, Chicago, Illinois; counsel for defendant Howard B. Silverman.
George W. Spellmire, John C. Everhardus, and Jonathan S. Goodman, D'Ancona & Pflaum LLC, Chicago, Illinois; counsel for James D. Dolph.
Lawrence C. Ashby, Ashby & Geddes, Wilmington, Delaware; John L. Hardiman, William L. Farris, and Fraser L. Hunter Jr., Sullivan & Cromwell, New York, New York; counsel for defendants Sandler O'Neill Corporate Strategies and Sandler O'Neill & Partners L.P.

OPINION
McKELVIE, District Judge.
The actions in this litigation arise out of the corporate restructuring and bankruptcy of Reliance Acceptance Group, Inc. ("the Company"). The Company is a Delaware corporation, and was formerly known as Cole Taylor Financial Group, Inc. Plaintiffs (collectively, the "Graham Plaintiffs") are former shareholders of the Company. Defendants (collectively, the "Graham Defendants") are former officers, directors, accountants, financial advisors, and subsidiaries of the Company, and other entities formed in the corporate restructuring. The court will refer to this case, C.A. No. 99-858-RRM, as the "Graham case."
On February 2, 1998, the Graham Plaintiffs filed suit against the Graham Defendants in the U.S. District Court for the Northern District of Illinois, seeking monetary damages for alleged violations of §§ 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b), 78n(a), and 78t(a), and for breaches of the Graham Defendants' fiduciary duties under Delaware law.
On December 9, 1999, the Judicial Panel on Multidistrict Litigation ordered that the Graham case be transferred to this court to consolidate discovery and other pre-trial matters with two related cases. Allen v. Taylor, et al., C.A. No. 99-146-RRM (the "Allen case"), is a consolidated adversary bankruptcy proceeding pending in this court involving state law fraudulent transfer claims, fiduciary duty claims, professional malpractice claims, and other related common law claims. Sabbia, et al. v. Reliance Acceptance Group, Inc., et al., C.A. No. 99-859-RRM (the "Sabbia case"), is a consolidated securities action that was filed in the U.S. District Court for the Western District of Texas.
The Graham Defendants have filed motions to dismiss in the Graham case pursuant to Fed.R.Civ.P. 4(m) for failure to serve process within 120 days, Fed. *712 R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted, and Fed.R.Civ.P. 9(b) and § 21D(b) of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C.A. § 78u-4(b)(1, 2), for failure to plead fraud with specificity. This is the court's decision on these motions.

I. FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the consolidated amended complaint, as well as from publicly filed documents that are central to plaintiffs' complaint, and that have been attached to one or more defendants' motions to dismiss. See Duferco Steel Inc. v. M/V Kalisti, 121 F.3d 321, 324 n. 3 (7th Cir.1997). For the purposes of a motion to dismiss, the court accepts all allegations in the complaint as true and draws all reasonable inferences in favor of plaintiffs. See Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir.1989).

A. The Company's Expansion Period

Irwin Cole and Sidney Taylor founded the Company in the early 1980s, and the Company issued stock in a public offering in 1994. The Cole and Taylor families were the Company's largest shareholders, each owning approximately 25% of its outstanding stock. By the early 1990s, Jeffrey Taylor, Bruce Taylor, and Sidney Taylor (collectively, "the Taylor Family") served as the CEO, President, and Chairman of the Executive Committee of the Company, respectively. By the time the events at issue occurred, both Irwin Cole and his daughter Lori Cole (collectively, the "Cole Family") were Directors of the Company, but they had no day-to-day role in its operations.
The Company had two subsidiaries. The first, Cole Taylor Bank (the "Bank"), was a regional lender based in Chicago, with a record of sustained profitability but slow growth.
The Company's second subsidiary, Reliance Acceptance Corp. ("RAC"), was founded in approximately 1992, and was based in San Antonio, Texas. RAC specialized in extending automobile loans to high risk, or "subprime," buyers. From its inception, Howard Silverman served as Chairman of RAC's Board of Directors, and Thomas Barlow served as RAC's CEO.
RAC implemented expedited procedures for authorizing loans, including a program to process loans within one hour. This program was popular with automobile dealers, who could arrange financing for a buyer before he or she left the parking lot. Under this program, RAC expanded its loan portfolio rapidly. From 1993 to 1996, RAC's gross finance receivables grew nearly 20-fold, from $24.4 million to $429 million. Throughout this period of expansion, the Company's annual net income grew from $198,000 in 1993 to $9.6 million in 1995. The Company's stock price rose from approximately $18 per share in 1995 to a high of approximately $31 in the Fall of 1996.
The Company's Board of Directors allegedly received a 1995 report issued by the Federal Reserve Board stating that RAC's loan portfolio was deteriorating. The Federal Reserve Board reported that it had reviewed five of RAC's branch offices, rating four of them "marginal," and the fifth "unsatisfactory." The report disclosed, moreover, that RAC had an approximately 83 % staff turnover annually.
The Company's directors also allegedly received a December 1995 internal audit report that two-thirds of RAC's 36 branch offices were underwriting loans based on incomplete and inaccurate credit investigations. A July 1996 internal report revealed that 55% of RAC's branches were failing to properly investigate credit applications.
According to the Graham Plaintiffs, the loss rate for RAC's loans increased annually, from 4.5% in 1993 to 25.3% in 1996. During this same time period, the Graham Plaintiffs allege, RAC's loan loss reserves *713 dropped from 6.18% of its total loans in 1993 to 4.08% by 1996.
Peat Marwick audited the consolidated balance sheet and consolidated statements of income for the Company and its wholly owned subsidiaries for the years 1994, 1995, and 1996. Peat Marwick issued audit reports in each of these years. According to the Graham Plaintiffs, the January 24, 1995 report is representative of the other reports, stating:
We have audited the accompanying consolidated balance sheet of Cole Taylor Financial Group and its wholly owned subsidiaries ("the Company") as of December 31, 1994, and the related consolidated statements of income, changes in stockholders' equity and cash flows for the year then ended....
We conducted our audit in accordance with generally accepted auditing standards. ... We believe that our audit provides a reasonable basis for our opinion.
In our opinion, the 1994 consolidated financial statements referred to above present fairly, in all material respects, the financial position of Cole Taylor Financial Group, Inc. and its wholly owned subsidiaries as of December 31, 1994, and the results of their operations and their cash flow for the year then ended in conformity with generally accepted accounting principles.
Generally accepted accounting principles ("GAAP") govern the level of loan loss reserves that companies are to maintain to offset credit losses. The AICPA Audit and Accounting Guide  Audits of Finance Companies § 2.04 states:
A finance company should maintain a reasonable allowance for credit losses applicable to all categories of receivables through periodic charges to operating expenses. The amount of the provision can be considered reasonable when the allowance for credit losses, including the current provision, is adequate to cover estimated losses in the receivable portfolio.

B. The Split-Off Transaction

During the first half of 1995, substantial disagreements began to develop between the Cole Family and certain other directors, on the one hand, and the Taylor Family and certain other directors, on the other hand, regarding the strategic direction of the Company. The Cole Family proposed a number of transactions for restructuring the Company, which the Taylor Family resisted. The Cole Family, at its own expense, engaged Sandler O'Neill Corporate Strategies to evaluate the options available to the Company. In August 1995, a special committee of the Company's directors determined that the dispute between the Coles and the Taylors was disrupting the management and performance of the Company. In September 1995, the Company's Board of Directors voted to retain Chicago Corp. (subsequently renamed ABN AMRO, Inc.), which had a long-standing relationship with the Company, to provide advice regarding the Company's strategic options. On November 3, 1995, the Company publicly announced the retention of Sandler O'Neill and Chicago Corp. (collectively, the "Financial Advisors") to identify potential candidates for acquiring all or part of the Company.
On January 31, 1996, the Taylor Family proposed a split-off transaction in which, immediately after the transfer of certain automobile loans assets and cash from the Bank to another subsidiary of the Company, the Taylor Family would exchange its existing shares of common stock in the Company, as well as certain additional shares of common stock, for all of the outstanding common stock of the Bank. On April 19, 1996, the Taylor Family submitted an improved written proposal, increasing the number of shares of the Company's common stock that would be exchanged for Bank stock, and changing the assets that would be transferred from the Bank to cash and accounts receivable.
*714 The Financial Advisors identified a third party interested in acquiring the Bank. The CEO of the third party, however, declined to proceed with the transaction absent unanimous consent of the Company's Board of Directors. After Jeffrey Taylor indicated to the CEO that he did not support the sale of the Bank to a third party, the CEO stated to the Board that he would not submit a bid on the Bank as long as the Taylors' split-off transaction was under consideration.
In conjunction with the split-off transaction proposed by the Taylor Family, the Financial Advisors each reviewed the audited financial statements and other financial data for the Company and discussed the Company's financial status with management. The Financial Advisors told the Board that the value of the consideration to be received under the Taylor Family proposal was approximately equal to the consideration discussed by the third party interested in acquiring the Bank. The Financial Advisors noted that the risk that the Taylor Family proposal would not be consummated was greater than that of the third party's proposed acquisition, because the Taylor Family would be required to obtain a favorable tax ruling, and would need to raise additional capital. The Financial Advisors noted, however, that the Taylor proposal was not subject to due diligence.
The Board held a special meeting on June 12, 1996 for the purpose of considering the proposed transaction with the Taylor Family. On this date, the Financial Advisors each rendered a written opinion to the Board. The Chicago Corp.'s opinion, which is restated nearly verbatim in Sandler O'Neill's opinion, recites: "Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the Consideration to be received by the Company pursuant to the Agreement is fair from a financial point of view, to the non-Taylor Family shareholders of the Company." The Board approved the terms of the transaction and authorized its execution by a unanimous vote of the directors present.
According to the Graham Plaintiffs, on October 10, 1996, the Company filed a Form 8-K with the SEC, signed by then-CFO Christopher Alstrin. This form contained financial statements for the years 1993 to 1995, as well as audit reports prepared by KPMG Peat Marwick. The Company stated in its filing that RAC's "nonrefundable dealer discount [for credit losses] is adequate to absorb possible losses on credits that may become uncollectible."
The Company invited its shareholders to vote upon the proposed split-off transaction, and disseminated a proxy statement, dated October 15, 1996, to its shareholders. The proxy statement contained in full the fairness opinions prepared by the Financial Advisors. The proxy statement disclosed that the members of the Cole and Taylor Families, as well as the other executive officers and directors of the Company, all intended to vote in favor of the split-off. Collectively, these individuals held approximately 55% of the outstanding stock of the Company. Since a simple majority of the shares was necessary to approve the split-off, the proxy statement recited that:
The affirmative votes of the Taylor Family, the Cole Family and the other executive officers and directors of the Company will, collectively, be sufficient to approve the Share Exchange Agreement and the Split-Off Transactions and the amendment to the Company's Certificate of Incorporation to effect the Name Change, regardless of the votes of any other stockholders.
On November 15, 1996, the Company's shareholders voted in favor of the split-off transaction.
On January 29, 1997, the press reported that Mercury Finance, a subprime automobile lender that was also founded by Silverman, had been fraudulently overstating its net income for the past several years. In the wake of this news, the Company's *715 stock price fell from $29 per share on January 29 to $17-3/4 on February 7, 1997.
On February 7, 1997, the Company announced to the financial press that "[p]reparation for the split-off transaction has caused the Company to take additional time, beyond the time historically taken, to prepare and issue its 1996 financial statements." On February 12, 1997, the Company announced the close of the transaction. Two days later, on February 14, 1997, the Company issued a press release announcing that "it would make significant provisions for credit losses for the fourth quarter of 1996," and that the Company "expects to report a loss for the fourth quarter of 1996." On March 3, 1997, the Company issued a press release stating that these credit losses totaled $18 million. Barlow, the Company's President and CEO, stated in the press release that "[w]e have taken the necessary steps to ensure that the reserves in our existing portfolio are adequate and that we control the amount of credit losses."
The Company filed its 1996 Form 10-K with the SEC on March 31, 1997, stating that "the nonrefundable dealer discount and allowance for credit losses are sufficient to cover existing estimated losses."
On May 7, 1997, the Company issued a press release announcing that it was reporting a loss of $9.9 million for the first quarter, attributable to a provision for credit losses of $22.2 million in the quarter. The Company therein announced Barlow's resignation as President and CEO. Silverman, who assumed Barlow's positions, stated in the press release that the Company was in default on some of its covenants to its lenders. The Company's stock dropped 26% that day from $9.00 to $6.625. The next day, the Chicago Sun-Times reported that Silverman "insisted Reliance's balance sheet remains sound," and that "Silverman stressed his company's woes do not involve financial fraud or mismanagement."
On August 14, 1997, the Company issued a press release reporting a loss of $40.2 million for the second quarter ending June 30, 1997, attributable in part to a provision for credit losses of $60.9 million in the quarter. The Company filed its second quarter Form 10-Q the same day, disclosing that the Company would severely curtail further 1997 operations because it "will probably have to use virtually all of its net cash flow to pay down its revolving credit agreement to $200 million."
On November 14, 1997, the Company issued a press release announcing a loss of $12.8 million for the third quarter, attributable in part to a $10 million provision for credit losses. The Company filed its Form 10-Q for the third quarter the same day, and announced that "[i]f the Company is not able to sell, merge or recapitalize itself in the near term, resorting to federal bankruptcy protection is very likely." On February 9, 1998, the Company filed a petition for relief under Chapter 11 of the United States Bankruptcy Code in the District of Delaware.

C. Procedural Background of the Litigation

Beginning in January 1998, nine putative classes of plaintiffs (collectively, the "Sabbia Plaintiffs") filed suit in the U.S. District Court for the Western District of Texas in the case presently captioned Sabbia, et al. v. Reliance Acceptance Group, Inc., et al., C.A. No. 99-859-RRM (the "Sabbia case"). The Sabbia Plaintiffs are suing essentially the same defendants named in the Graham case, and assert securities law claims and supplemental state law claims analogous to those raised in the Graham case, as discussed below.
On February 2, 1998, the Graham Plaintiffs filed suit against the Graham Defendants in the U.S. District Court for the Northern District of Illinois in the case presently captioned Graham, et al. v. Taylor Capital Group, Inc., et al., C.A. No. 99-858-RRM (the "Graham case"). The Graham Plaintiffs amended their complaint *716 on March 20, 1998, adding the Financial Advisors as defendants.
On March 11, 1998, a group of putative lead plaintiffs in the Sabbia litigation, consisting of Michael Sabbia, Darius Antia, Michael Havrilesko, Bank West Financial Corp., Walter W. Goldberg IRA Rollover, and Michael Wien (collectively, "the Sabbia Group"), filed a motion in the Texas court to be appointed lead plaintiffs in the Sabbia case. On April 7, 1998, the Sabbia Group filed a motion in the Illinois court to be appointed lead plaintiffs in the Graham case, as well.
On June 1, 1998 and June 9, 1998, the Texas court ordered the consolidation of the nine cases in the Sabbia litigation. Upon consideration of competing motions for appointment of lead plaintiffs, on June 29, 1998, the Texas court appointed the Sabbia Group lead plaintiffs in the Sabbia case. The court found that the Sabbia Group had the largest financial interest in the litigation, and that they satisfied the other requirements imposed by Fed. R.Civ.P. 23 for appointment as lead plaintiffs.[1] On the same date, the Texas court approved the Sabbia Group's choice of David B. Kahn & Associates, Ltd. and Milberg Weiss Bershad Hynes & Lerach LLP as co-lead counsel.
After being appointed lead plaintiffs in the Sabbia case, the Sabbia Group argued to the Illinois court that they should be appointed lead plaintiffs in the Graham case to permit a unified lead plaintiff structure in both cases. On July 16, 1998, the Illinois court appointed the Sabbia Group lead plaintiffs in the Graham case and approved their choice of David B. Kahn & Associates, Ltd. and Milberg Weiss Bershad Hynes & Lerach LLP as co-lead counsel.
On August 16, 1998, the Sabbia Group, on behalf of the Graham Plaintiffs, filed a consolidated amended complaint in Illinois in the Graham case. This consolidated amended complaint is the focus of this Opinion, and the court will discuss its contents in greater detail below. On August 21, 1998, the Sabbia Group, on behalf of the Sabbia Plaintiffs, filed a consolidated amended complaint in the Sabbia case.
Beginning in August 1998, a number of defendants in the Sabbia case moved to transfer the Sabbia case to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a).[2] Other defendants in the Sabbia case moved for coordination or consolidation of the Sabbia and Graham actions pursuant to 28 U.S.C. § 1407.[3]
On September 4, 1998, David Allen, the estate representative of the Chapter 11 estate of Reliance Acceptance Group, Inc. and its subsidiaries, filed two adversary *717 bankruptcy proceedings in the United States Bankruptcy Court for the District of Delaware against many of the defendants named in the Sabbia and Graham cases. Allen asserts state law fraudulent transfer claims, fiduciary duty claims, professional malpractice claims, and other related common law claims. On March 12, 1999, a number of the defendants in these adversary bankruptcy proceedings filed motions in the U.S. District Court for the District of Delaware to withdraw the reference to the Bankruptcy Court and to consolidate the adversary proceedings. On July 15, 1999, the District Court granted the motions to consolidate the cases, and on July 22, 1999, the District Court granted the motions to withdraw the reference to the Bankruptcy Court. The consolidated adversary bankruptcy proceedings are presently captioned Allen v. Taylor, et al., C.A. No. 99-146-RRM (the "Allen case").
On November 3, 1999, the Illinois court ordered the dismissal without prejudice of the consolidated amended complaint in the Graham case with respect to defendants Tinberg and Dougherty.
On December 9, 1999, the Judicial Panel on Multidistrict Litigation ordered the transfer of the Graham and Sabbia cases to the U.S. District Court for the District of Delaware to consolidate pre-trial proceedings with the Allen case. Centralizing pretrial proceedings in this court, the Panel ruled, is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and to conserve the resources of the parties, their counsel and the judiciary.

D. The Graham Plaintiffs' Complaint

The present Opinion concerns the consolidated amended complaint filed in the Graham case in the Illinois court on August 16, 1998. The Graham Plaintiffs assert five counts against the Graham Defendants.
Count I of the complaint alleges that a number of the individual officers and directors of the Company, namely, Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Irwin Cole, Lori Cole, Barlow, Silverman, James Dolph, Christopher Alstrin, Michael Bernick, William Race, Ross Mangano, Solway Firestone, Melvin Pearl, and Dean Griffith, and the Company's auditor, Peat Marwick, are liable under § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.A. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, for knowingly or recklessly making public statements containing material misrepresentations regarding the financial condition of the Company.
Count II alleges that Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Irwin Cole, Lori Cole, Mangano, Firestone, Pearl, Griffith, Barlow, Silverman, Alstrin, Bernick, Race, Richard Tinberg, Adelyn Dougherty, Peat Marwick, and the Financial Advisors are liable under § 14(a) of the Exchange Act, 15 U.S.C.A. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, for knowingly or recklessly making material misstatements in the October 1996 proxy statement.
Count III alleges that Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Irwin Cole, Lori Cole, Mangano, Firestone, Pearl, Griffith, Barlow, Silverman, Alstrin, Bernick, and Race are vicariously liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for violations of the securities laws by persons they controlled.
Count IV alleges that Taylor Capital, Tinberg, Dougherty, Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Irwin Cole, Lori Cole, Mangano, Firestone, Pearl, Griffith, Barlow, Silverman, Alstrin, Bernick, and Race breached their fiduciary duties to the Graham Plaintiffs under Delaware law by failing to disclose material facts necessary for shareholders to make informed investment decisions.
Count V alleges that Jeffrey Taylor, Bruce Taylor, Sidney Taylor, Taylor Capital, and Cole Taylor Bank breached their fiduciary duties arising under ERISA when they engaged in self-dealing by acquiring *718 Cole Taylor Bank for inadequate consideration.
Irwin Cole died after the original complaint was filed. The consolidated amended complaint names Shirley Cole, Lori Cole, and Cathy Cole Williams as executors of Irwin Cole's estate. Shirley Cole, Lori Cole, and Cathy Cole Williams, in their capacity as executors of Irwin Cole's estate, are collectively referred to as "Irwin Cole."
The Graham Plaintiffs seek compensatory damages.

E. Defendants' Motions to Dismiss

Barlow, Silverman, Irwin Cole, Lori Cole, Pearl, Dolph, Firestone, Griffith, Mangano, Race, Peat Marwick, ABN AMRO, and Sandler O'Neill move to dismiss the claims alleged in the Graham Plaintiffs' consolidated amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), asserting that the Graham Plaintiffs have failed to plead fraud with specificity, as required by Fed.R.Civ.P. 9(b) and § 21D(b)(1, 2) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C.A. § 78u-4(b)(1, 2). With respect to the Graham Plaintiffs' fiduciary duty claim, the Graham Defendants assert that an exculpatory clause in the Company's corporate charter releases them from liability. The Financial Advisors, moreover, move to dismiss the complaint pursuant to Fed. R.Civ.P. 4(m) for failure to serve process within 120 days.

II. DISCUSSION

Throughout the remainder of this Opinion, unless otherwise indicated, the parties referred to by the court are parties in the Graham case.
The court will apply Third Circuit law to resolve questions of federal law raised in defendants' motions to dismiss. See Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir.1993) ("[A] transferee federal court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit.")

A. Motions to Dismiss for Untimely Process

The Financial Advisors move to dismiss the complaint under Fed.R.Civ.P. 4(m) for failure of plaintiffs to serve process within 120 days of filing suit.[4] The Financial Advisors contend that the complaint filed in this case naming them as defendants was filed in the Northern District of Illinois on March 20, 1998, yet they did not receive service for approximately eighteen months. This delay, the Financial Advisors argue, warrants dismissal under Rule 4(m). See MCI Telecommunications Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1097 (3d Cir.1995) (permitting courts to dismiss complaints for failure to serve process within 120 days of filing complaint when plaintiff has not shown good cause for delay).
Counsel for the Sabbia Group, lead plaintiffs in the Graham action, have advanced a number of explanations for why the Financial Advisors did not receive timely service. First, counsel assert that the Sabbia Group did not file the original complaint in the Illinois action, but rather that the Illinois court ordered the Sabbia Group to serve as lead plaintiffs on July 16, 1998, several months after the other plaintiffs in the Graham case first filed their complaint against the Financial Advisors. Second, counsel argue that an injunction entered by the U.S. Bankruptcy Court for the District of Delaware on October 5, 1998 prevented the prosecution of *719 the Graham case. Even if good cause were lacking for the delay in serving process upon the Financial Advisors, counsel contend, this court has discretion to deny dismissal under Rule 4(m). See id. Counsel argue that it would be proper to deny dismissal because the Financial Advisors suffered no prejudice through the delay. Rather, counsel state that the Financial Advisors were fully informed of the nature of the claims brought against them because they received timely service of the complaint filed in the Sabbia litigation in the Western District of Texas asserting claims analogous to those raised here. Moreover, there were no substantial proceedings in the Graham case prior to the Financial Advisors' receipt of service, counsel contend.
It appears that the failure to serve process on the Financial Advisors was inadvertent. Counsel for the original plaintiffs in the Graham case apparently failed to serve the Financial Advisors, as did counsel for the Sabbia Group when the Sabbia Group was appointed lead plaintiffs. The Delaware Bankruptcy Court's injunction did not prevent service of process on the Financial Advisors, as the injunction specifically permits parties to "effect service of process upon any defendant therein ... who has not yet been served." The court finds no good cause for failure to comply with Rule 4(m).
The court has discretion to deny a motion to dismiss for failure to comply with Rule 4(m) in the absence of good cause. See MCI, 71 F.3d at 1098. One factor to consider is whether defendants have been harmed by the delay in service. See id. at 1097; Binicewicz v. General Electric Co., 1995 WL 628425, at *3 (N.D.Ill. Oct.25, 1995). Dismissal under Rule 4(m) is without prejudice, so the Graham Plaintiffs would presumably re-file their complaint against the Financial Advisors. See MCI, 71 F.3d at 1098. Here, the Financial Advisors have not shown that they were harmed by the untimely service of process. The Financial Advisors were properly served in the Sabbia case, and so would remain a party to litigation pending in this court even if the court dismissed the complaint in this case. Presumably, all that would be gained from a dismissal without prejudice on this ground would be that the Graham Plaintiffs would file an identical complaint against the Financial Advisors. Because the court finds that dismissing the complaint would not be productive and would cause unnecessary expense, the court will accordingly deny the Financial Advisors' motions to dismiss pursuant to Rule 4(m). See Vax v. Commissioner, 156 F.R.D. 272, 274 (N.D.Ga.1994).

B. Motions to Dismiss Claims Under Rule 10b-5

Plaintiffs allege that the defendants named in Count I of the consolidated amended complaint are liable for securities fraud under § 10(b) of the Exchange Act, 15 U.S.C.A. § 78j(b),[5] and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5,[6] for knowingly or *720 recklessly making material misstatements or omissions in conjunction with the preparation and disclosure of the Company's financial data. Plaintiffs contend that these false statements artificially inflated the Company's stock price, that they would not have otherwise purchased the stock at the prices they paid, and that they suffered monetary damages as a result.
To ultimately prevail on the merits, plaintiffs must show that: (i) defendants made a misstatement or omission; (ii) of a material fact; (iii) with scienter; (iv) in connection with the purchase or sale of securities; (v) upon which plaintiffs relied; and (vi) that reliance proximately caused plaintiffs' losses. See In re Westinghouse Securities Litigation, 90 F.3d 696, 710 (3d Cir.1996); Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir.1995). The first, third, and sixth prongs of this analysis are at issue in this case.

1. Do plaintiffs adequately allege that defendants made a misstatement or omission?

The court will first consider the arguments raised by the Company's outside directors, Lori Cole, Irwin Cole, Mangano, Firestone, Race, Griffith and Pearl, and then will consider the arguments raised by Barlow, Silverman, Dolph, and Peat Marwick.

a. The outside director defendants

Lori Cole, Irwin Cole, Mangano, Firestone, Race, Griffith and Pearl assert that plaintiffs' complaint should be dismissed as to them because they are outside, nonmanaging directors, and because plaintiffs fail to aver that they made a misstatement or omission. These defendants contend that plaintiffs have only alleged that they signed, or helped prepare, SEC filings that may have contained misstatements, and that the act of signing, or participating in the preparation of, group-published documents does not amount to a misstatement or omission. See In re GlenFed, Inc. Securities Litigation, 60 F.3d 591, 593 (9th Cir.1995) (affirming the dismissal of complaint against outside directors where no particularized involvement in the company's operations was alleged); In re Aetna Inc. Securities Litigation, 34 F.Supp.2d 935, 949 (E.D.Pa.1999) (same).
Plaintiffs argue that the outside directors may be held liable under Rule 10b-5 for having signed, or having aided in the preparation of, false or misleading financial disclosure statements, particularly when the directors served on committees responsible for the Company's financial oversight. See Danis v. USN Communications, Inc., 73 F.Supp.2d 923, 939 n. 9 (N.D.Ill.1999).
Lori Cole, Mangano, Firestone, Race, and Griffith were each Directors of the Company, and they each served on the Company's Audit Committee or Financial Oversight Committee. Irwin Cole and Pearl were Directors of the Company and members of its Executive Committee. Although the complaint does not attribute any specific misstatement to these defendants, the wrong complained of-that the Company maintained declining loan loss reserves as its loan loss rates increased-is the kind of matter that these defendants may have been personally responsible for overseeing. See Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1255 (N.D.Ill. 1997) (denying motions to dismiss for defendants in positions to detect severe deficiency of credit losses). These defendants allegedly prepared, approved, or reviewed the Company's financial statements containing material overstatements to its net income. Plaintiffs have not yet had the opportunity to take discovery to determine the role that these defendants played in the Company, and the extent to which they *721 were knowledgeable of the alleged inadequacy of the Company's loan loss reserves. In light of these defendants' membership on the Company's Audit Committee, Financial Oversight Committee, or Executive Committee, the court will permit plaintiffs to conduct discovery to determine whether these defendants made actionable misstatements or omissions. See Danis, 73 F.Supp.2d at 939 n. 9.

b. Barlow

Plaintiffs allege that Barlow, as CEO of RAC, misrepresented the financial condition of the Company in several statements made in the Company's press releases. According to plaintiffs, when the Company disclosed strong earnings attributable to RAC in the second quarter of 1996, Barlow commented that "[w]e have a strong reserve position and we continue to monitor our static pool loss history to ensure the adequacy of our reserves." In mid-1996, when RAC began making increasing charges to the loan loss reserve, Barlow allegedly characterized the shift in accounting practices as a timing decision, stating: "The ultimate effect of the changes we have made in the recognition of estimated losses is purely timing of the write-offs against reserves which we had established concurrently with the acquisition of these assets." Plaintiffs contend that these remarks misled investors by falsely assuring them of the adequacy of the Company's loan loss reserves.
Barlow argues that, as an officer of the Company's subsidiary, he cannot be held liable for misconduct by the parent company's officers. The court finds no support for this notion, however, and concludes that a reasonable shareholder of the Company might have detrimentally relied on his statements made as CEO of RAC.
Barlow contends that these statements are not actionable misstatements for the purposes of Rule 10b-5, because they are forward-looking statements that are protected by the statutory safe-harbor provision of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-5(c)(1)(B)(i). These statements, however, are not projections, as are protected by the safe-harbor provision. See In re Advanta Corp. Securities Litigation, 180 F.3d 525, 536 (3d Cir.1999). Rather, they are directed to the then-present state of the Company's financial condition. In light of plaintiffs' allegations that the Company's loss reserves were declining as its loan loss rates were increasing, the court finds that Barlow's statements regarding the strength of its reserve position may have been misleading.

c. Silverman

Plaintiffs contend that Silverman, as the Company's CEO, misled investors as to the Company's financial condition. After the Company disclosed in a May 7, 1997 press release that it was in default on some of its covenants to its lenders, Silverman stated that "[w]ith our capital base and the increased level of reserves for possible credit losses, I believe that we have the financial strength to remain a major player in our industry." The Chicago Sun-Times reported the next day that "Silverman stressed his company's woes do not involve financial fraud or mismanagement, unlike Lake Forest-based Mercury or Deerfield-based First Merchants Acceptance Corp., where top executives likewise quit or were fired." Plaintiffs argue that through these statements Silverman misled investors by falsely assuring them of the Company's financial integrity.
Like Barlow, Silverman argues that these statements should be protected by the statutory safe-harbor provision for forward-looking statements. 15 U.S.C. § 78u-5(c)(1)(B)(i). The court finds, however, that his statement regarding possible fraud or mismanagement is not a forward-looking statement.

d. Dolph

Dolph became the Company's CFO on March 13, 1997. Plaintiffs allege that *722 by the time Dolph took office, the Company had understated its credit losses by over $110 million, and that Dolph became aware of this "within months" after he took office. Plaintiffs allege that Dolph failed to report the full extent of these losses in the Company's financial disclosure statements, and that he wrongfully delayed their disclosure.
Dolph argues that plaintiffs are impermissibly attempting to prove fraud by hindsight. See DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990). Dolph contends that plaintiffs have failed to plead specific facts showing that the statements made in the Company's financial disclosure forms since March 1997 contained knowing or reckless misstatements.
Plaintiffs have adequately averred that the Company may have overstated its net income by approximately $110 million at the time that Dolph became CFO. If Dolph delayed the disclosure of the Company's credit losses to the public, as is alleged by plaintiffs, then his signing or preparation of the Company's financial disclosure statements may constitute misstatements or omissions for the purposes of Rule 10b-5.

e. Peat Marwick

Peat Marwick argues that plaintiffs have failed to plead that it misrepresented the Company's financial condition. Even if the Company was under-reserved, Peat Marwick contends, the fact that it audited the Company's financial statements and found them in compliance with GAAP is inadequate to support a finding of securities fraud. See Shapiro v. UJB Financial Corp., 964 F.2d 272, 283 (3d Cir.1992). Because the correct application of accounting standards is a matter of professional judgment, allegations that a defendant failed to adhere to accounting principles, without more, are not generally actionable. See Melder v. Morris, 27 F.3d 1097, 1103 (5th Cir.1994). Peat Marwick contends that plaintiffs' allegations amount to hind-sight, as is prohibited by DiLeo, 901 F.2d at 627.
Plaintiffs counter that the complaint properly specifies Peat Marwick's misconduct. Plaintiffs contend that Peat Marwick audited the Company's financial statements and represented that the Company's financial position was in conformity with GAAP. Plaintiffs argue that Peat Marwick knew that the Company's loan loss reserves were declining as a percentage of net receivables during the time in which its loan loss rate was increasing. By stating that the Company's financial statements were in conformity with GAAP, plaintiffs argue, Peat Marwick misrepresented the financial condition of the Company.
The court must accept as true plaintiffs' allegations that the Company's loan loss rate increased from 4% of net finance receivables in 1993 to over 20% in 1996. During this period, the Company's reserves allegedly decreased from 6.18% of net finance receivables in 1993 to 4.08% in 1996. Plaintiffs' have shown that Peat Marwick may have been aware of the increasing loss rate of the Company's portfolio, particularly in light of the 1995 Federal Reserve Board report stating that the portfolio was deteriorating. Moreover, the Company's new CFO, Dolph, discovered the inadequacy of the Company's reserve allowances within weeks of taking office. In light of these allegations, the court finds that Peat Marwick may have misrepresented the Company's financial position when it stated that its financial statements were in compliance with GAAP.

2. Do plaintiffs adequately allege that defendants acted with scienter?

Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to satisfy the requirements under Fed. R.Civ.P. 9(b) and the PSLRA, 15 U.S.C.A. § 78u-4(b)(2), for pleading scienter. Fed. R.Civ.P. 9(b) requires plaintiffs to plead *723 fraud with specificity,[7] and the Private Securities Litigation Reform Act of 1995 heightened this burden by requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u-4(b)(2).[8] In the Third Circuit, plaintiffs have the burden to plead scienter either by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior. Advanta, 180 F.3d at 534-35.
The court will first review the motions filed by the individual defendants, and then will consider Peat Marwick's motion. Because the court finds that plaintiffs have adequately pled facts to support a finding that defendants' conduct may have been reckless, the court will not consider the parties' arguments as to whether defendants had a motive and an opportunity to commit fraud.

a. The individual defendants

The individual defendants contend that plaintiffs have failed to plead facts supporting a finding that defendants' conduct amounted to an "extreme departure from the standards of ordinary care," which is required for a finding of recklessness. Id. at 539. Defendants, and most emphatically the outside director defendants, contend that plaintiffs have failed to particularize how each defendant was aware of the alleged insufficiency of the loan reserves. See id. at 539 ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."); In re Digi International, Inc. Securities Litigation, 6 F.Supp.2d 1089, 1101-02 (D.Minn.1998) (dismissing claim for lack of specific pleading as to how defendant officer was knowledgeable of fraud concerning affiliated company). Failure to adequately account for risks, or disregarding negative trends, defendants argue, may amount to mismanagement, but it does not constitute recklessness under Rule 10b-5. See Advanta, 180 F.3d at 540.
Plaintiffs argue that the complaint adequately supports their claims of recklessness. Plaintiffs state in their complaint that the "nature and loss rate trends of [a company's] portfolio are the most critical facts of the subprime auto loan business and knowing about them was central to the duties and responsibilities of each of the Individual Defendants." Failure to know readily available facts that are critical to a defendant's job performance, plaintiffs contend, constitutes circumstantial evidence of fraud. See In re Tel-Save Securities Litigation, 1999 WL 999427, at *5 (E.D.Pa. October 19, 1999); LaSalle National Bank v. Duff & Phelps Credit Rating Co., 951 F.Supp. 1071, 1087 (S.D.N.Y. 1996). Plaintiffs contend that the individual defendants were responsible for the financial oversight of the Company, and that they were aware of the declining condition of the Company's loan portfolio. Despite knowing that the Company's loan loss *724 rates were increasing, defendants allegedly overstated the Company's income in its financial disclosure statements by failing to take adequate allowances for loan losses. By preparing, signing, approving, or reviewing financial statements that failed to take adequate charges against earnings, plaintiffs conclude, the individual defendants' conduct constitutes an extreme departure from the standards of ordinary care.
The court finds that the individual defendants may have been responsible for overseeing the financial integrity of the Company, or responsible for representing the Company's financial condition to the market. Lori Cole, Irwin Cole, Mangano, Firestone, Race, Griffith, and Pearl each served on the Company's Audit Committee, Financial Oversight Committee, or Executive Committee. Barlow and Silverman each made statements directly to the investing public regarding the Company's loan loss reserves. Dolph served as CFO after the split-off transaction.
Plaintiffs may not impute knowledge of the Company's financial infirmities to defendants solely by nature of the positions they held. See Advanta, 180 F.3d at 539. The court finds, however, that plaintiffs have pled adequate facts to support a finding that defendants may have known, at the time they prepared, approved, or reviewed the Company's financial disclosure statements, that the Company's net income was overstated. The court must accept as true plaintiffs' allegations that the director defendants each received a 1995 Federal Reserve Board report stating that the Company's loan portfolio was deteriorating, as well as a 1995 internal audit report indicating that two-thirds of RAC's 36 branch offices were underwriting loans based on incomplete and inaccurate credit investigations. Barlow, although he was not a director of the Company at the time, appears to have been knowledgeable about the Company's credit losses, as he gave statements to the press regarding the strength of RAC's reserve position. Dolph revealed the inadequacy of the Company's loan loss reserves in its financial disclosure statements he signed as CFO.
The court must accept as true plaintiffs' allegations that the Company began experiencing a sharp increase in the loss rate on its loans, from 4.5% in 1993 to 25.3% in 1996. During this same time period, the Company's loan loss reserves allegedly declined as a percentage of finance receivables, in violation of GAAP. GAAP violations, alone, do not constitute fraud. See In re First Merchants Acceptance Corp. Securities Litigation, 1998 WL 781118 (N.D.Ill. Nov.4, 1998) (citing cases). When combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of recklessness. See id.; Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1255 (N.D.Ill.1997).
The court finds that such other circumstances are present here. During the class period, the Company's officers and directors made numerous statements to the press and in its financial disclosure statements reassuring investors that the Company's loan loss reserves were sufficient. Defendants allegedly had knowledge of the deteriorating condition of the Company's loan portfolio, as discussed above. See Advanta, 180 F.3d at 539 (identifying knowledge of defendants as key factor in scienter inquiry). Maintaining adequate loan loss reserves was purportedly critical to the financial integrity of the Company. See Tel-Save, 1999 WL 999427, at *5 ("The inquiry focuses on whether the transaction in which the alleged fraud occurred was central to the corporation's core business."); Rehm, 954 F.Supp. at 1256 (stating that credit losses were the "defining characteristic" of loan servicing business). If the Company's loan loss reserves actually declined as a percentage of net income during the time when its loan loss rate was increasing, then the individual defendants' conduct may amount to more than a failure to assess risks or to recognize a negative *725 trend in the industry. See Advanta, 180 F.3d at 539-40; Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124 (2d Cir.1994); DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990). The week prior to the close of the split-off transaction, the Company delayed the release of its financial disclosure statements, and then, two days after the closing, the Company announced it would take charges against its income for credit losses, later quantified at $18 million. See Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1224 (1st Cir.1996) (stating that timing of disclosures may constitute circumstantial evidence of fraud). Moreover, Dolph apparently discovered that the Company's income was overstated within weeks of becoming its CFO, as shown by the increasing charges he took against the Company's income in its 1997 financial disclosure statements. See First Merchants, 1998 WL 781118, at *11 (denying motion to dismiss where new CFO "almost immediately discovered the discrepancies in the financial statements").
The individual defendants insist that plaintiffs have failed to particularize the involvement of each defendant in the alleged fraud. The court is mindful, however, that the present posture of the case is a motion to dismiss. Plaintiffs have not had the benefit of discovery to determine the role that each of the defendants played in the Company and the level of knowledge they may have had regarding the alleged deficiency in its loan loss reserves. Because the court is satisfied that plaintiffs have averred substantial circumstantial evidence of recklessness, the court will not require plaintiffs to specify, at this stage in the litigation, the involvement of each defendant in the alleged fraud. To impose a stricter standard at the pleading stage "would make virtually impossible a plaintiff's ability to plead scienter in a financial transaction involving a corporation, institution, bank or the like that did not involve specifically greedy comments from an authorized corporate individual." Press v. Chemical Investment Services Corp., 166 F.3d 529, 538 (2d Cir.1999). See also First Merchants, 1998 WL 781118, at *7 n. 3 ("The fact that Plaintiffs do not have all of the specific documents to support their claims at this time is not fatal to their complaint."); STI Classic Fund v. Bollinger Industries, Inc., 1996 WL 885802, at *2 (N.D.Tex. Oct.25, 1996) ("The actual contents of the books and records and these individuals' knowledge thereof are peculiarly within the Movants' knowledge and control, thereby warranting some relaxation in the application of Rule 9(b)."). In factual circumstances similar to those at issue here, the court in Rehm v. Eagle Finance Corp. denied defendants' motions to dismiss, stating:
The very heart of this case, then, is whether defendants knew or recklessly disregarded the systematic undercounting of credit loss reserves and nevertheless continued to disseminate the inaccurate data. If this is true, there may be no direct evidence showing defendants were aware of the true credit loss figures. Instead, the only evidence would be the large reporting discrepancy and defendants' public attempts to downplay the seriousness of Eagle's credit loss situation. In this context, to require plaintiff to proffer evidence that defendants were fully aware of Eagle's actual credit loss situation would be incompatible with the recklessness prong of the "circumstantial evidence" test.
Rehm, 954 F.Supp. at 1256-57. As in Rehm, the court finds that plaintiffs' allegations are sufficient to support a finding that defendants may have acted recklessly in preparing, approving, or reviewing the Company's financial disclosure statements.
Plaintiffs' allegations of recklessness are weakest as to Dolph. Dolph became the Company's CFO after the close of the split-off transaction, and after the Company's stock price had collapsed. Dolph appears to be the individual who discovered the deficiencies in the Company's loan loss reserves, and who disclosed this information to the public. Plaintiffs' allegations *726 amount to the accusation that Dolph became aware "within months" of taking office that the Company had overstated its income by over $110 million, and that he delayed disclosing the full extent of the Company's credit losses to the public. Although plaintiffs have not alleged particular misconduct by Dolph, the court finds that plaintiffs' allegations of recklessness in the financial management of the Company are credible. Because Dolph, as the Company's CFO, is a key officer in this dispute, the court will permit plaintiffs to conduct discovery as to any potential misconduct by him, and will reconsider the merits of the claim against Dolph and the other defendants in the context of a motion for summary judgment.

b. Peat Marwick

Peat Marwick argues that plaintiffs have failed to allege that it acted recklessly. Calculating loan loss reserves, Peat Marwick contends, is a matter of professional judgment. See Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1021 (5th Cir.1996). Even if it the Company was under-reserved, Peat Marwick asserts, it cannot be found liable for securities fraud simply by auditing the Company's financial statements and finding them in compliance with GAAP. See id. General allegations that a defendant violated GAAP or generally accepted auditing standards ("GAAS") are inadequate to support a claim under Rule 10b-5. See Greebel v. FTP Software, Inc., 194 F.3d 185, 203-04 (1st Cir.1999).
Plaintiffs counter that they have alleged more than that Peat Marwick merely audited the financial statements of an under-reserved company. Plaintiffs contend that Peat Marwick was aware that the Company was rapidly expanding its portfolio and acquiring increasingly risky loans. Peat Marwick was aware of this increasing risk, plaintiffs assert, by nature of its service as the Company's auditor, and by other information it received, such as the 1995 Federal Reserve Board report stating that the Company's loan portfolio was deteriorating. Plaintiffs assert that the Company's loan loss reserves decreased while its loan loss rates increased, and that Peat Marwick nonetheless stated that the Company's financial statements complied with GAAP. This constitutes, according to plaintiffs, "highly unreasonable conduct, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." First Merchants, 1998 WL 781118, at *10 (citing SEC v. Price Waterhouse, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992)). Peat Marwick's audits, plaintiffs contend, amounted to "no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." Id. (citing Price Waterhouse, 797 F.Supp. at 1240); Rehm, 954 F.Supp. at 1255. The inadequacy of Peat Marwick's audits, plaintiffs add, is underscored by the fact that Dolph uncovered the Company's overstated income within weeks of becoming CFO. See id. at *11 (denying motions to dismiss where new CFO revealed fraud "almost immediately").
The court, in consideration of the factual allegations averred by plaintiffs, concludes that Peat Marwick may have acted recklessly in stating that the Company's financial statements were in accordance with GAAP. The court places particular emphasis on plaintiffs' allegations that the Company's loan loss reserves declined from 1993 to 1996 while its loan loss rates increased. Peat Marwick does not appear to dispute that the Company could reduce its loan loss reserves in compliance with GAAP only if the risk associated with its loan portfolio was decreasing. During the downward adjustment of its reserves, however, the Company's loan portfolio was *727 deteriorating, as stated in the 1995 Federal Reserve Board report, and as reflected in the increase in the Company's loan loss rates. The court finds that, by stating that the Company's financial disclosure statements were in compliance with GAAP, it may have made accounting judgments that no reasonable accountant would have made if confronted with the same facts. See First Merchants, 1998 WL 781118, at *10; Rehm, 954 F.Supp. at 1255.

3. Do plaintiffs adequately plead causation?

Pearl and Dolph argue that plaintiffs have failed to plead facts supporting the accusation that their alleged misconduct proximately caused plaintiffs' loss. The court will consider these defendants' positions in turn.

a. Pearl

Pearl argues that, even if he wrongfully misrepresented the Company's financial condition, his conduct did not proximately cause plaintiffs' loss. Pearl notes that the stock value of the Company plummeted after the January 29, 1997 collapse of Mercury Finance and after rumors began to circulate regarding the financial integrity of the subprime auto lending industry as a whole. Pearl contends that these events are the intervening cause of plaintiffs' claimed losses, and that they disrupt the causal connection between his alleged misconduct and plaintiffs' losses. See Bastian v. Petren Resources Corp., 892 F.2d 680, 685 (7th Cir.1990) ("If the defendants' oil and gas ventures failed not because of the personal shortcomings that the defendants concealed by because of industry-wide phenomena that destroyed all or most such ventures, then the plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendant's fraud and have no claim to damages.").
Plaintiffs contend that Pearl's alleged misconduct artificially inflated the price of the Company's stock, as the market is presumed to incorporate information from all publicly available sources and to reflect such information in the stock price. See Basic Inc. v. Levinson, 485 U.S. 224, 241-42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Plaintiffs argue that because of Pearl's alleged misconduct, they paid more than the stock price was worth, and suffered greater damage when the stock price fell.
The court finds that the present case is distinct from Bastian, 892 F.2d at 685, as it was not an event wholly out of Pearl's control, such as a collapse in oil prices, that allegedly caused the loss complained of. Rather, plaintiffs attribute their losses to fraudulent financial reporting within the Company. The court finds that plaintiffs have sufficiently averred facts supporting their allegations of fraud, and will permit plaintiffs to take discovery to determine whether Pearl, who was a member of the Company's Executive Committee, made any material misstatements or omissions that plaintiffs may have relied upon to their detriment.

b. Dolph

Dolph notes that the Company's stock price collapsed prior to March 13, 1997, the date he became CFO. Plaintiffs have not identified a single purchase or sale of securities after March 13, 1997, and accordingly, he argues, he cannot be liable for losses attributed to purchases before this date. See Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1420 (7th Cir.1992) ("[P]ost-purchase statements cannot form the basis of Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased.").
Plaintiffs contend that they have no duty to establish in the pleadings that a specified plaintiff bought stock on or around the time of each alleged misstatement.
The court notes that the class period runs until November 14, 1997. The court finds no support for the notion that plaintiffs *728 must identify particular purchases of stock between March 13, 1997 and the end of the class period in order to sustain their allegations against Dolph. To the extent that the bulk of plaintiffs' stock purchases were made prior to his taking office, or that the stock price collapsed before that date, the court finds that this is relevant to the amount of the damage award that may be ultimately assessed against Dolph. The court does not find as a matter of law, however, that Dolph's alleged misstatements could not have caused losses to plaintiffs.
The court will accordingly deny the defendants' motions to dismiss Count I of the complaint.

C. Motions to Dismiss Claims Under Rule 14a-9

Plaintiffs assert that the defendants named in Count II of the consolidated amended complaint violated § 14(a) of the Exchange Act, 15 U.S.C.A. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9. Rule 14a-9 prohibits solicitation of shareholder votes by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. To establish a cause of action for a violation of Rule 14a-9, a plaintiff must demonstrate: (1) that the defendants made a material misrepresentation or omission on a proxy statement; (2) with the requisite state of mind; and (3) that the proxy solicitation was an essential link in effecting the proposed corporate action. Halpern v. Armstrong, 491 F.Supp. 365, 378 (S.D.N.Y.1980).

1. Did defendants make material misrepresentations or omissions in the proxy statement?

ABN AMRO asserts that it cannot be held liable under Rule 14a-9 because it is an independent advisor that did not solicit proxies, and because it did not benefit from the outcome of the shareholder vote. See Mendell v. Greenberg, 612 F.Supp. 1543, 1551-52 (S.D.N.Y.1985). Third Circuit law, however, permits a finding of liability under Rule 14a-9 by those who make material misstatements or omissions in proxy statements, regardless if the defendant is an outside expert that does not benefit from the outcome of the solicitation. See Herskowitz v. Nutri/System, Inc., 857 F.2d 179, 189-90 (3d Cir.1988) ("Moreover since an investment banker rendering a fairness opinion in connection with a leveraged buyout knows full well that it will be used to solicit shareholder approval, and is well paid for the service it performs, we see no convincing reason for not holding it to the same standard of liability as the management it is assisting."). Accordingly, the court will deny ABM AMRO's motion to dismiss on this ground.
ABN AMRO and Silverman also contend that any statements attributed to them in the proxy statement are protected by the statutory safe harbor of the PSLRA for forward-looking statements. 15 U.S.C. § 78u-5(c). ABN AMRO's statement that the transaction would be fair to the non-Taylor family shareholders, however, omits consideration of whether the Company's income might be overstated due to inadequate allowances for loss reserves. The proxy statement, which Silverman may have helped prepare, similarly fails to disclose that the Company's loan loss reserves declined as its loan loss rates increased. These omissions may be actionable under Rule 14a-9, and the court will allow plaintiffs to conduct discovery on this issue.

2. Did defendants act with the required state of mind?

Plaintiffs contend that this court should sustain the allegations under Rule 14a-9 as long as the complaint avers that defendants acted negligently in the preparation of the proxy statement. Allegations of negligence, plaintiffs argue, need not be *729 pled with particularity. Defendants, on the other hand, argue that scienter is the requisite state of mind for violations of Rule 14a-9, and that the PSLRA requires that complaints be pled with particularity.
The Supreme Court, in Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1090 n. 5, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), expressly reserved its ruling on the question of whether scienter is necessary for liability under Rule 14a-9. Under Third Circuit law, negligence, not scienter, is the standard of liability under Rule 14a-9. See Herskowitz, 857 F.2d at 190; Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 777 (3d Cir.1976). While the PSLRA, 15 U.S.C.A. § 78u-4(b)(2), might be interpreted as raising the pleading requirements for alleging violations of Rule 14a-9, the court will await direction from the Third Circuit before contravening express precedent on this issue. Accordingly, the court will not apply the heightened pleading requirements of the PSLRA to plaintiffs' claims under Rule 14a-9.
The court will deny the motions by the defendants named in Count II to dismiss this Count on this ground. The court has already determined that plaintiffs have alleged sufficient facts to suggest that the defendants named in Count I of the complaint may have acted recklessly in preparing, approving, or reviewing the financial statements of the Company. The additional defendants named in Count II, namely ABN AMRO and Sandler O'Neill, analyzed the Company's audited financial statements and other financial information and rendered opinions concluding that the split-off transaction would be fair to the Company's non-Taylor family shareholders. According to plaintiffs' allegations, which the court must accept as true, the Financial Advisors knew that RAC's loan portfolio had grown dramatically, that the delinquency rates on the loans had increased, and that the portfolio was deteriorating, as stated in the 1995 Federal Reserve Board report. These allegations suffice to sustain plaintiffs' claims that the Financial Advisors may have acted negligently in rendering their fairness opinions.

3. Was the proxy statement an "essential link" in the split-off transaction?

Defendants assert that any alleged misstatements or omissions in the proxy statement could not have caused plaintiffs' claimed losses as a matter of law, because the votes of the outstanding shareholders were not necessary to approve the split-off transaction. The proxy statement discloses that approval of the transaction required the affirmative vote of a majority of the outstanding shares. As stated in the proxy statement, members of the Taylor Family beneficially owned approximately 25% of the Company's outstanding stock, members of the Cole Family beneficially owned approximately 25% of the stock, and the other executive officers and directors of the company collectively held approximately 4.7% of the Company's outstanding stock. The proxy statement says that these individuals had indicated their intent to vote in favor of the transaction, and that their affirmative vote would be sufficient to approve the split-off, "regardless of the votes of any other stockholders." Because a majority of the shareholders had expressed their intention to approve the transaction prior to the issuance of the proxy statement, defendants argue, any alleged misstatements or omissions contained in the proxy statement could not have impacted the outcome of the vote or caused harm to plaintiffs. Defendants rely on Virginia Bankshares, 501 U.S. at 1083, 111 S.Ct. 2749, in support of this proposition.
In Virginia Bankshares, a company holding 85% of a target company's stock sought to acquire the remaining 15% of the shares in a "freeze out" merger. After receiving an opinion that $42 a share would be a fair price for the minority stock, the executive committee and the full board of the target company approved the *730 merger proposal at that price. Although the acquiring company's 85% stake in the target company was sufficient to approve the transaction without a shareholder vote, the target company nevertheless solicited proxies for voting on the proposal, purportedly for public relations reasons. In the proxy statement, the directors of the target company stated that they believed that $42 was a "high" price for the shares. Most minority shareholders gave the proxies requested, and the transaction was approved.
A minority shareholder who voted against the proposal complained that the directors misled the outstanding shareholders by stating in the proxy statement that they believed that $42 was a "high" price for the stock. In support of her Rule 14a-9 claim, plaintiff argued that: 1) the directors' statement in the proxy solicitation was materially misleading; 2) the proxy vote was essential for consummating the merger, as the affirmative vote of the minority shareholders was necessary for public relations reasons; and 3) the shareholder vote was essential to satisfy regulatory requirements under Virginia law.
The Court determined that the directors' statement, although conclusory in nature, might have been materially misleading. See id. at 1098, 111 S.Ct. 2749. The Court next addressed whether the affirmative vote of the minority shareholders was an "essential link" in consummating the transaction, even though the proxy statement was directed to only 15% of the shareholders. See id. at 1102, 111 S.Ct. 2749. The Court considered plaintiff's argument that the directors of the target company, in light of public relations concerns, would not have consummated the merger absent approval from the minority shareholders. The Court held that plaintiff failed to demonstrate, as a matter of law, that the alleged misstatements in the proxy statement could have caused her losses. The Court ruled that the asserted causal connection was too vague, and that litigation of her theory would lead to open-ended speculation as to what the directors would have done if the minority shareholders had disapproved the merger. See id. at 1105, 111 S.Ct. 2749. Reliable evidence would seldom exist, the Court reasoned, to substantiate plaintiff's allegations that the proxy vote was an essential link in approving the merger. See id. The Court also ruled that use of the proxy statement was not essential to satisfy regulatory requirements under Virginia law. See id. at 1101-02, 111 S.Ct. 2749.
The crux of the issue in the present case is whether the proxy vote was essential to the consummation of the split-off transaction. Plaintiffs attempt to distinguish this case from Virginia Bankshares on the grounds that the Coles (and the other non-Taylor officers and directors of the Company) were misled into committing their votes in favor of the transaction. Plaintiffs argue that the Coles, like the other outstanding shareholders, were victims of the alleged fraud, and would never have voted in favor of the transaction had they known the truth regarding the Company's financial condition. In support of their allegations, plaintiffs note that, on August 19, 1998, the Coles filed suit in the Court of Chancery of the State of Delaware alleging that the Taylors and other defendants defrauded the Coles, and breached their fiduciary duties to the Coles, by failing to disclose material information to them in conjunction with the split-off transaction. See Cole, et al. v. Taylor, et al., C.A. No. 16594 (Del.Ct. Ch.1998) (the "Cole case").
It is unclear whether plaintiffs will be able to establish adequate facts through discovery to show that the Coles were misled into supporting the transaction and that they would have withdrawn their support of the transaction if they knew the full extent of its risks. The court notes that it is possible, especially in light of the Cole case, that the votes the Coles had previously committed to approving the transaction were a product of the alleged fraud. If so, then the allegedly misleading information may have misled the owners of *731 a majority of the outstanding shares. For this reason, it appears that this case may be distinct from Virginia Bankshares, as there is a question of fact as to whether, absent the alleged fraud, a majority of the Company's officers and directors would have committed their shares to approval of the split-off transaction. The fact that the Coles have filed suit in the Chancery Court raising the same issues asserted by plaintiffs here indicates that plaintiffs' claims are not unduly vague and speculative, as prohibited by Virginia Bankshares. For these reasons, the court will permit plaintiffs to gather facts in support of their theory of causation, and will revisit this issue in the context of a motion for summary judgment. Accordingly, the court will deny defendants' motions to dismiss Count II of the consolidated amended complaint.

D. Motions to Dismiss Claims Under § 20(a)

Plaintiffs assert that the defendants named in Count III of the complaint are vicariously liable under § 20(a) of the Exchange Act for violations of the securities laws committed by persons over whom they exercised control.
Section 20(a) of the Exchange Act imposes joint and several liability on any "person who, directly or indirectly, controls any person liable" for securities fraud under the Act, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violations. 15 U.S.C. § 78t(a). In order to establish liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. See Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.1998) (citing cases). Plaintiffs must show that defendants generally exercised control over the accused operations, but need not demonstrate that defendants actually exercised their authority to control the specific transaction or activity that is alleged to give rise to liability. See Donohoe v. Consolidated Operating & Production Corp., 30 F.3d 907, 911-12 (7th Cir.1994).
Plaintiffs have averred substantial circumstantial evidence to show that the financial disclosure statements issued by the Company contained material misstatements or omissions regarding the adequacy of the Company's loan loss reserves. The individual defendants named in Count III each held positions on the Company's Audit Committee, Financial Oversight Committee, or Executive Committee, or were highlevel officers who may have exercised day-to-day control over the Company's operations. It is a factual question as to whether the defendants exercised control over persons committing violations of the securities laws, and plaintiffs have averred adequate evidence of fraud to allow discovery to proceed on this issue.
Barlow urges that his service as CEO of RAC precludes his liability for securities law violations relating to the Company's stock. The court finds no support in the caselaw for this notion. Plaintiffs have alleged that the persons responsible for overseeing RAC's finances failed to maintain adequate loan loss reserves. It is a question of fact as to whether Barlow, as CEO of RAC, may have exercised control over people who may have made fraudulent misstatements or omissions.
The court will deny defendants' motions to dismiss on this issue.

E. Motions to Dismiss Claims Under Delaware Fiduciary Duty Law

Plaintiffs assert that defendants breached their fiduciary duties owed to the Company's shareholders under Delaware law. Plaintiffs allege that defendants failed to inform plaintiffs that RAC had inadequate loss reserves, and thus that they withheld information necessary for a reasonable *732 shareholder to make an informed vote regarding the split-off transaction.
Defendants argue that they are immune from such liability. Defendants point to the Company's corporate charter, which includes an exculpatory clause releasing its directors from liability under certain claims brought by the corporation or its stockholders. Specifically, Article XII, Paragraph B of the charter provides in part:
B. Elimination of Certain Liability of Directors: No director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, as the same exists or hereafter may be amended, or (iv) for any transaction from which the director derived an improper personal benefit.
See also 8 Del. C. § 102(b)(7) (authorizing Delaware corporations to include exculpatory clauses in their charters). The exculpatory clause does not release directors from liability for breaches of the duty of loyalty, or for intentional misconduct done in bad faith. Defendants argue, however, that plaintiffs' allegations do not articulate a breach of the duty of loyalty, or intentional acts of misconduct. Rather, defendants assert that plaintiffs' claims amount, at most, to allegations of a breach of the duty of care. The exculpatory clause, defendants argue, releases them from liability for breaches of the duty of care.
Delaware law distinguishes between the duty of loyalty and the duty of care. See Krim v. ProNet, Inc., 744 A.2d 523, 527-28 (Del.Ch.1999). A breach of loyalty claim requires some form of self-dealing or misuse of corporate office for personal gain. Solash v. Telex Corp., 1988 WL 3587, at *7-8 (Del.Ch. Jan.19, 1988). To show a breach of the duty of care, plaintiffs must overcome the presumption, known as the business judgment rule, that the defendant directors have acted on an informed basis and in the honest belief they acted in the best interest of the corporation. See Krim, 744 A.2d at 527-528. If plaintiffs' claims allege solely a violation of the duty of care, and do not also allege the existence of circumstances constituting intentional fraud or self-dealing, then the court will grant defendants' motions to dismiss. See In re Lukens Inc. Shareholders Litigation, 1999 WL 1135143, *1 (Del. Ch. Dec.1, 1999).
Plaintiffs have averred sufficient circumstantial evidence to permit the inference that one or more defendants may have knowingly withheld material information from the Company's shareholders. Such conduct may rise to a violation of the directors' duty of loyalty to the Company's shareholders, and thus would not warrant immunity under the exculpatory clause of the Company's corporate charter. The court notes that a number of the director defendants owned substantial holdings of the Company's stock, and that it is unlikely that they made intentional misrepresentations that would have harmed themselves and the other shareholders. The court, however, will permit plaintiffs to conduct discovery on this issue to determine whether any of the directors' conduct amounts to a violation of their duty of loyalty.
Pearl makes the additional argument that Count IV should be dismissed because the claim for the alleged breach of fiduciary duty is derivative of the corporation, and that the individual shareholders lack standing to assert this claim. The test to determine whether a claim is derivative or an individual harm is whether plaintiffs suffered a "special injury." In re Tri-Star Pictures, Inc., Litigation, 634 A.2d 319, 330 (Del.1993). "A special injury is established where there is a wrong suffered by plaintiff that was not suffered by *733 all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote." Id. Here, the wrong alleged by plaintiffs is that defendants' alleged misrepresentations or omissions in the proxy statement deprived them of their right to vote. Individual shareholders have standing to assert this claim. See id.
Accordingly, the court will deny defendants' motions to dismiss Count IV of the complaint.

III. CONCLUSION

The court will issue an Order consistent with this Opinion denying defendants' motions to dismiss plaintiffs' consolidated amended complaint.
NOTES
[1] Fed.R.Civ.P. 23 provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties fairly and adequately protect the interests of the class.
[2] 28 U.S.C. § 1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.
[3] 28 U.S.C. § 1407 provides in pertinent part:

(a) When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated: Provided, however, that the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded.
[4] Fed.R.Civ.P. 4(m) provides in relevant part:

Time Limit for Service. If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.
[5] 15 U.S.C. § 78j(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange-
(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
[6] Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
[7] Rule 9(b) of the Federal Rules of Civil Procedure provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
[8] 15 U.S.C.A. § 78u-4(b) provides:

(1) Misleading statements and omissions. In any private action arising under this chapter ... the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
(2) Required state of mind. In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.